Milton Alpert, J.
In 1966 when the new opera house was opened at Lincoln Center in New York City, the Metropolitan Opera Association, Inc., moved its opera performances from its building on Broadway between 39th and 40th Streets in New York City to the new facility at Lincoln Center. The association then entered into a lease for the "Old Met,” as the old opera house was called, wherein the lessees agreed to demolish the old building and erect a large office building on the site. By the terms of the lease, the association was to receive stipulated rentals and, at the end of the lease, it would own the building as well as continue its ownership of the land.
Claimants, a limited partnership, became the assignees of the lease, and, pursuant to the lease, possession of the "Old Met” was delivered to them on May 10, 1966 which date commenced the running of the lease term. An application for a demolition permit was made by them to the Superintendent of Buildings of the City of New York on May 16, 1966.
However, sometime prior to May 10, 1966, a group of interested citizens mounted an effort and campaign to preserve the "Old Met” as an historical and unique facility. On May 16, 1966, the day application for the demolition permit was made, the Legislature passed a bill, which was signed by the Governor on June 24, 1966 (L 1966, ch 691), whereby a corporation was created with the powers of condemnation for the purpose of acquiring and preserving the "Old Met.” By this statute, the Superintendent of Buildings of the City of New York was authorized to withhold and refuse the issuance of the demolition permit for 180 days upon the deposit of $200,000 as security and pending action by the newly created corporation in raising funds and acquiring the "Old Met” within such time period.
The issuance of the permit was withheld. Claimants instituted proceedings against the city’s building commissioner and *622 the newly created corporation to have the statute declared unconstitutional and were successful (Matter of Keystone Assoc. v Moerdler, 19 NY2d 78, decided Dec. 30, 1966). The demolition permit was issued January 17, 1967, eight months after application had been made. Also, claimants received $154,700 from the security deposit, including interest thereon, referred to above.
Claimants filed the instant claim seeking damages for the temporary appropriation of claimants’ property by the State for the period between May 16, 1966 when the application for the demolition was filed and January 17, 1967, the date the permit was issued. The claim, alleging a de facto taking, has been held to state a cause of action against the State (Keystone Assoc. v State of New York, 39 AD2d 176, affd 33 NY2d 848) and is before the undersigned for determination of damages.
The Appellate Division in its decision in Keystone (supra, at p 178) has indicated that a de facto taking did occur and that the measure of damages for property appropriated for a temporary period of time is the loss of rental value during the time plus any damage to the fee caused by the temporary use. The de facto taking requires compensation to the same extent as a de jure taking.
Claimants contended that the damages sustained include the loss of rent for the period of the taking, i.e., eight months, plus the additional cost of construction occasioned by the delay, plus legal fees and expenses incurred in the course of having the special act of the Legislature declared unconstitutional. In addition, they have claimed legal fees and expenses incurred in litigating the instant claim.
The State, on the other hand, claims that no loss occurred because the claimants erected the envisioned building with an additional floor and, as a result of the delay, achieved higher rents which more than offset the increased cost of construction. Also, the State argues that the amount received by claimants from the security deposit amply compensated them for the loss of rental value of the land during the time they were delayed in proceeding with demolition and construction work. In addition, the State argues that no legal fees and expenses are allowable.
The lease is for a period of 50 years from the date of possession, May 10, 1966, and contains two renewal options. The rental is a fixed net rental with carrying charges borne *623 by the tenant. For the first four years the rental was $200,000 per year, $400,000 per year for the next six years, and then it increased by $50,000 per year for each succeeding 10-year period until the end of the term. After the initial 50-year term, if renewal options are exercised, a formula contained in the lease comes into effect for computing the rent. By the terms of the lease, demolition of the "Old Met” was to start within six months of delivery of possession to the lessee and completion of the 40-story building was to be within three years of such delivery.
Thus, we have a 50-year term for the lease from which claimants allege that eight months were carved out by the delay occasioned by the temporary de facto taking which is the basis of this claim. They allege that they were obligated to pay the basic ground rent for eight months without any benefit or ability to use the property. This computes to $133,333.32. Considered on a domino effect basis, claimants allege that construction was delayed as well as occupancy and thus, that claimants lost eight months’ rental income. By the same token, claimants did not have to pay eight months’ maintenance and operating expenses. Thus, we have here, in effect, a claimed damage consisting of eight months’ loss of profit. Claimants also seek to recover the increase in the cost of construction occasioned by the eight-month delay.
In addition to the preceding, claimants seek reimbursement for legal fees and expenses incurred in having the special act declared unconstitutional, and costs and expenses incurred in establishing damages for the temporary appropriation, i.e., cost of appraisals and impact studies. It is claimant’s contention that the instant cause of action was created by the testing of the special act; and that by the language of the Appellate Division wherein reference is made to Terrace Hotel Co. v State of New York (19 NY2d 526) these elements of damage are recoverable. As noted above, the State’s position is that these claimed legal fees and expenses are not allowable.
After careful study of the opinions of the Court of Appeals and the Appellate Division, Third Department, in Keystone, (19 NY2d 78 and 39 AD2d 176, affd 33 NY2d 848) this court has come to the conclusion and so finds, that this is not the usual type of claim for an appropriation of private property by the State to which the usual rules of damages are applicable. Rather, this court concludes and so finds, based on the above-described careful study, that the majority opinions of the *624 above courts in the Keystone litigation have indicated to this court that money damages should be awarded which should not be limited to the rental value of the vacant land, but rather should be determined by initial consideration of Keystone’s increased cost of construction and loss of profits for the period during which the building would have been completed and occupied, but which was made impossible by the unauthorized taking action for which such courts have found the State to be liable. This is the period that has been carved out of claimants’ 50-year lease term by reason of the temporary appropriation.
The majority opinion of the Court of Appeals in Matter of Keystone Associates v Moerdler (supra, at p 88) has a quotation from Forster v Scott (136 NY 577, 584-585) which is found by this court to be significant.
"Whenever a law deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment, that materially affect its value, without legal process or compensation, it deprives him of his property within the meaning of the Constitution. All that is beneñcial in property arises from its use and the fruits of that use, and whatever deprives a person of them deprives him of all that is desirable or valuable in the title and possession. It is not necessary, in order to render a statute obnoxious to the restraints of the Constitution, that it must in terms or in effect authorize an actual physical taking of the property or the thing itself, so long as it affects its free use and enjoyment, or the power of disposition at the will of the owner.” (Emphasis added.) We went on (pp 584-585) to conclude that the plaintiff in that case, was "deprived of the right to build upon his lot by the statute in question, and as this circumstance obviously impaired its value and interfered with his power of disposition, it was to that extent void as to him”.
Furthermore, this court reads the majority opinion as having rejected the concept that a portion of the annual land rental would be a sufficient damage payment for the delay here. The same opinion at pages 88 and 89 referred to rent and maintenance exceeding $113,000 and to real property taxes exceeding $125,000. The opinion then went on to say, at page 89, that these amounts "do not even include the other damages which Keystone claims it has suffered” and that "there is little question but that Keystone will suffer damages *625 considerably in excess of the posted security” — which security was in the amount of $200,000.
When the above is considered against the specific reference (19 NY2d, at p 91) in the minority opinion of Chief Judge Desmond of the Court of Appeals and the reference in the Appellate Division’s majority opinion of Presiding Justice Herlihy (39 AD2d at p 178) to the "measure of damages for property appropriated for a temporary period of time” as being " ’the loss of rental value during that time plus any damage to the fee caused by the temporary use’ ”, this court believes that by affirmance of the latter opinion (33 NY2d 848) the Court of Appeals intended that a greater measure of damages would be applicable than merely the rental value of the land. At that point in time, the Court of Appeals knew that the delay period would be less than one year because that court itself, by handing down its decision, was pretty much fixing the termination date of such delay period. Yet, with this knowledge the majority of that court, in clear and specific language, rejected the concept that $200,000 — the rental for an entire year — would be sufficient to compensate Keystone.
The foreseeable and certain effect of the delay to which Keystone was subjected was the increased cost of construction and its loss of profit from the completed building for the period of the delay in its completion. This court believes that a measure of damages relating to such increased cost and loss of profit must be applied to carry out the clearly apparent intent of the Court of Appeals as to an appropriate measure of damages.
In this respect, this court rejects the State’s position that Keystone has been adequately compensated by the payment to it of $154,700, including interest, from the $200,000 required security deposit, this position of the State being based on what this court regards as a strict and limited construction of the rule as to damages set forth in Chief Judge Desmond’s minority opinion in the Court of Appeals decision in Keystone (19 NY2d at p 91) and quoted in Presiding Judge Herlihy’s opinion at the Appellate Division, as noted above, and which opinion was adopted by the majority of the Court of Appeals in its affirmance (33 NY2d 848). Rather, this court finds that a full reading of the rule, including emphasis on the language "plus any damage to the fee caused by the temporary use”, would yield a proper measure of damages that should compensate Keystone for the increased cost of construction and its *626 loss of profits for the period of the delay in completion of its building which were caused by the unauthorized action of the State.
This court has carefully read and considered Matter of Westchester County (204 Misc 1031) and City of Yonkers by Kelly v A. & J. Cianciulli, Inc. (117 NYS2d 792) and the discussions therein concerning measures of condemnation damages as not including compensation for losses in rental income occasioned by delays attributable to the condemnor. However, for reasons described herein, this court finds these Westchester decisions to be inapplicable here.
The State has argued that Keystone should not, in any event, be entitled to damages for increased costs or loss of profits because the delay in completion of Keystone’s building caused Keystone to benefit from a higher rental market and, incidentally, also enabled Keystone to add another floor to its building, both of which the State claims would not have been possible if the delay had not occurred. These, the State argues, produced added revenues which more than offset the increased costs and lost profits.
The court’s reaction to this is that the basic objective here should be to make Keystone whole — regardless of the other legal bases for decision described above — and that if higher rentals were received than would have been received if the building had been completed eight months earlier, the same should in all fairness, be considered and weighed as against the increase in costs and the loss of profits for eight months (Worldwide Carriers v Aris S. S. Co. 301 F Supp 70, 71-72; Merchants Importing v Kuhn & Schneider, 27 AD2d 709). The court assumes that if the rental market had gone down— instead of up — because of the eight-month delay, Keystone would be urging the court also to award appropriate damages therefor. The rental market having in fact gone up, the State’s damages should, in all fairness, be mitigated thereby since, as was noted above, the basic purpose here is to make Keystone whole as a result of the entire experience.
Keystone has advanced the argument that the ruling in Chiesa v State of New York, (36 NY2d 21) is applicable here because it urges that its damages are for a direct taking and that benefits may not be offset against direct damages. The undersigned does not believe that the rule in Chiesa is applicable. We do not have here a State taking and improvement which benefits the area or Keystone’s property and the ques *627 tion of whether such a benefit should be offset against direct damages. Rather, we have here an action by the State which was detrimental to Keystone and its property rights and with respect to which the court is required to assay the resultant damage. Here, the court believes that money pluses and minuses should be weighed one against the other. Furthermore, we are not dealing here with before and after values because a computed difference between them would not produce a fair or appropriate measure of damages. Rather, our objective here must be to compute the dollars involved in total effect on claimant which must take into consideration not only additional capital outlay and loss of eight months’ profit, but also added rental income that resulted from the total experience. The court believes that this measure of damages is supportable by reasoning in cases such as President Hotel of Long Beach v State of New York (196 Misc 819, 822-823) and London v State of New York (196 Misc 823, 826-827).
The court now turns to the issue of legal fees. Ordinarily, counsel fees and legal expenses are not compensable in the Court of Claims when these are incident to litigation in this court (Court of Claims Act, § 27). However, in Terrace Hotel Co. v State of New York (19 NY2d 526, supra, also 31 AD2d 860) they were held to be compensable in the Court of Claims in the discretion of the court because of the special fact situation there. In Terrace the Court of Appeals (19 NY2d, at p 532) held that the Court of Claims had discretionary power to award such fees "whenever the State seeks to discontinue further exercise of the power of eminent domain. Accordingly, the cases must be sent back to the Court of Claims so that it may decide in its discretion, whether such counsel fees and legal expenses are warranted here.” In Terrace the appropriation action of the State in taking negative easements was held to be unauthorized. The State, accordingly, discontinued its appropriation action there and thus arose the above judicial decision concerning counsel fees and legal expenses.
The essential question in the instant claim is whether we are dealing with an identical or similar situation which requires or permits the application of the rule in Terrace. In this respect, this court believes it to be significant that there was the following reference to Terrace (at p 179) of the Appellate Division’s last decision in Keystone (39 AD2d 176, 179):
"The claim alleges damages and upon the present motion it *628 does not appear necessary to consider what might or might not be recoverable. It is noted that in the case of Terrace Hotel Co. v State of New York (supra) costs incurred in seeking damages for an appropriation were permissible where there was a discontinuance of the appropriation by the State. The State in enacting chapter 691 specifically recognized that damages might occur as the result of the 180-day inference [sic]. It is noted that the claim indicates that the claimant has received some moneys for damages from the fund provided in chapter 691 of the Laws of 1966.”
We regard this reference by the Appellate Division as indicating to this court that the rule in Terrace could be considered as applicable here because we have a discontinuance of a temporary taking because of lack of valid authorization for such taking (cf. Broughton v State of New York, 37 NY2d 451), where legal expenses to the time of arraignment or indictment were held allowable — i.e., to free a man’s person from basic illegal restraint; here, in the instant claim, the expenses were incurred in freeing Keystone’s interest in property from illegal restraint on the use of such property by Keystone. Also, compare London v State of New York (196 Misc 823, 827, supra) where there was an allowance by the Court of Claims of legal expenses incurred to free property from possession of former tenants illegally there.
The counsel fees which may be awarded are not those which are merely incidents of the instant litigation or which are not compensable in the absence of statutory authority providing for such (City of Buffalo v Clement Co. 28 NY2d 241, 262-263), but are those incurred in the proceedings to have the special act declared unconstitutional.
We conclude that the rule in Terrace is applicable here to such extent and that this court is authorized, in its discretion, to award reasonable counsel fees and legal expenses incurred in having the statute authorizing the taking declared unconstitutional, including expenses incurred in finally obtaining the demolition permit. However, with respect to counsel fees and legal expenses incurred with respect to the instant claim, the court finds that such fees and legal expenses are not allowable (City of Buffalo v Clement Co., 28 NY2d 241, 262-263, supra; Terrace Hotel Co. v State of New York, 19 NY2d 526, 531-532, supra; Court of Claims Act, § 27; cf. Broughton v State of New York, 37 NY2d 451, supra).
The court finds that the period of delay is from May 16, *629 1966 to January 17 1967 — a period of eight months (19 NY2d at p 85 and 39 AD2d at p 177). Based on data at pages 10, 28-31 of the State’s appraisal, the court also finds that the date of January 1, 1970 would be appropriate for considering when the building was completed for the purpose of computing interest on the award to be made by the court for increased cost of construction plus eight months loss of profits less the value of the increase in rents occasioned by the eight-month delay.
The court viewed the property and office building thereon after the trial was concluded.
The court now turns to actual determination of damages based on the above discussion concerning measures therefor.
Keystone’s appraiser did not give consideration to the subject of the State’s appraiser’s view that the eight-month delay had the effect of pushing Keystone’s rentals into a higher rental market and that the higher rentals more than offset Keystone’s damages. Accordingly, the court must look to the State’s appraisal for resolution of the problem.
The State’s appraiser noted that in order properly to measure the damages claimed by Keystone it is necessary for the appraiser to determine increase in construction costs, loss in profit, increase in office market rental value from 1966 through 1970, effect of adding an extra floor, and increases in operating costs and interest rates, without conceding compensability of the first two items. Then, on the basis of comparing two plans (I and II) based on a 21-month construction schedule commencing in May, 1966 as against a plan (III) based on the actual construction schedule commencing in January, 1967 and running to the end of 1969 and into 1970, he concluded at page 3 of his appraisal:—
"The increase in construction costs, carrying charges and operating charges for Plan III are more than offset by the higher office rents attained in the actual building because the so-called delay pushed the renting into a period where office space was very tight and rents were rising quite fast.
"In summary, the alleged delay in construction actually provided for a building with a greater return and a greater value than what could have been attained had the building been constructed in accordance with the proposed time schedule commencing May, 1966.” (The above is consistent with what he said (a) in his letter of transmittal which appears at the front of his appraisal and (b) at page 9 of his appraisal).
*630 The court notes that while at page 2 of the State’s appraisal loss in profit was denoted as an item to be considered without conceding compensability, such item is not specifically mentioned or included in the State’s appraiser’s above-quoted conclusion concerning what the increase in rents from delayed construction actually set off. He talks in terms of a building with a greater return and a greater value but does not specifically indicate that the loss of profit for eight months is set off.
In his appraisal he assumes all leases and rental agreements would have been entered into eight months earlier than actually occurred and that a lower per square foot rental would have been obtained. The data on pages 10-15 of his appraisal appear to bear out his basic contention that rentals entered into later were for higher per square foot amounts than those entered into earlier or during the first part of the rental period. The State’s appraiser’s presentation at page 14 of his appraisal indicates that the rental market and not leases for higher floors accounted for the trend toward increased rentals during the total rental period.
The State’s appraiser, at page 15 of his appraisal argues that the extra floor would not have been possible — based on a 21-month completion schedule — and at page 16 concludes that the increased cost of construction because of the eight-month delay was more than offset by increases in rental rates and the addition of the extra floor. The court does not accept his 21-month premise for completion of the building if demolition had been commenced in May, 1966. Testimony at the trial to the effect that a 21-month period was inadequate and unrealistic clearly preponderated. The court finds that the extra floor could have been added without difficulty if demolition had commenced in May, 1966. Accordingly, the court rejects the concept that the value of and rental income from the extra floor should be an offset.
However, the court believes that careful consideration must be given to the State’s appraiser’s view that the added income from higher rentals achieved because of the eight-month delay more than offset the increase in cost of construction — which claimant’s appraiser fixed at approximately $1,660,000 and which the State’s appraiser fixed at $1,968,732.
In addition to this view of the State’s appraiser, there is his further view at pages 17 and 22 of his appraisal that a more valuable building resulted because the eight-month delay *631 produced a higher rental income, which in turn produced a higher annual cash flow.
The court has carefully reviewed the rent schedule at pages 28-31 of the State’s appraisal, with particular reference to the time lengths of tenants’ leases in the building. Over half of them are for 10-year periods while some are for longer periods and some for less than 10-year periods. The court finds that a 10-year period is a reasonable one to consider for use here and will proceed accordingly.
For ease of a rough, elementary approach and computation, the court will analyze the rentals on pages 11-13 of the State’s appraisal by applying the average per square foot rental of the previous six-month period and note the result:—
1. Last half 1968 — 244,289 square feet at $6.64 instead of $7.65 actual. This produces approximately $1 per square foot less per year or approximately $245,000 less rental per year.
2. First half 1969 — 192,455 square feet at $7.65 instead of $8 actual. This produces approximately 35 cents per square foot less per year or approximately $65,000 less rental per year.
3. Last half 1969 — 215,628 square feet at $8 instead of $9.50 actual. This produces approximately $1.50 per square foot less per year or approximately $325,000 less rental per year.
4. First half 1970 — 76,570 square feet at $9.50 instead of $10.17 actual. This produces approximately 65 cents per square foot less per year or approximately $50,000 less rental per year.
5. Second half 1970 — 35,191 square feet at $10.17 instead of $10.40 actual. This produces approximately 25 cents per square foot less per year or approximately $9,000 less rental per year.
6. First half 1971 — 18,915 square feet at $10.40 instead of $9.20 actual. This produces approximately $1.20 per square foot more per year or approximately $23,000 more rental per year.
7. Second half 1971 — 18,435 square feet at $9.20 instead of $8.75 actual. This produces approximately 45 cents per square foot more per year or approximately $9,000 more rental per year.
8. First half 1972 — 13,428 square feet at $8.75 instead of $9.96 actual. This produces approximately $1.20 per square foot less per year or $16,000 less rental per year.
9. 1973 — 1,626 square feet at $9.96 instead of $12.37 actual. *632 This produces approximately $2.40 per square foot less per year or approximately $4,000 less rental per year.
10. 1974 — 1,767 square feet at $12.37 instead of $13.48 actual. This produces approximately $1.10 per square foot less per year or approximately $2,000 less rental per year.
The above analysis summarizes as follows:—
- $ 245,000
65.000
- 325,000
50.000
9.000
+ 23,000
+ 9,000
16.000
4.000
- 2,000
Minus $684,000 per year total rental if rentals had been entered into six months earlier.
Using a 10-year basis as reasonable and this six month write back approach would roughly produce a total of $6,840,-000 less rental income than the leases actually produced. Stated in other terms, over a 10-year period $6,840,000 more rental income is being produced than would have been produced by leases written six months earlier on the average. An eight-month write back would probably produce a figure of at least $700,000 per year.
The court compares its $700,000 per year computation of rental difference with the approximately $650,000 per year rental difference reached by the State’s appraiser by another method at page 16 of his appraisal.
In all fairness, an Inwood approach should be applied to compute a present value for the above income stream because we are dealing firstly with an eight-month profit loss in the first year of operation which claimant’s appraiser fixed at $3,328,300 and secondly with an increased construction cost which was actually experienced and which claimant’s appraiser fixed at $1,660,000, both of which the court adopts because it finds claimant’s proof in these respects preponderated.
The court will utilize the State’s appraiser’s figure for *633 increased rent of $650,000 per year and an 8% yield rate for risk capital. The court’s computations are as follows:—
Year 1..... ... $ 601,835
99 2..... 557,264
99 3..... 515,970
99 4..... 477,769
99 5..... 442,377
99 6..... 409,610
99 7..... 379,268
99 8..... 351,169
99 9..... 325,156
99 10. ... 301,074
total is...... ... $4,361,492
This is the computed present value of the additional income stream as described above.
The eight-month profit loss plus the increased cost of construction, according to Keystone’s appraiser and which the court adopted, total $4,988,300. Subtracting the above $4,361,-492 yields a difference of $626,800 rounded which the court finds should be awarded to Keystone for the claimed items of loss of profit plus increased cost of construction from which the court has subtracted a present value for an increased income stream of $650,000 per year over a 10-year period. From such $626,800 must be subtracted the $150,000 principal sum which claimant received from the security deposit. This is because claimant should not recover this item twice. The resultant award figure is $476,800 which should be awarded with interest at 6% per annum from January 1,1970.
There remains for consideration by the court the question of allowable attorney’s fees consistent with the court’s discussion above as to what legal fees may be allowed in the court’s discretion.
Legal fees claimed by Keystone and subject to reasonable allowance as described above total $300,000 as follows:—
1. Sullivan & Cromwell.................... $ 50,000
2. Kramer & Kaprow...................... 150,000
3. Bergreen & Bergreen.................... 100,000
The court has considered the contents of the exhibits and the testimony at the trial concerning such legal services. The court believes that the total charges exceed the test of reasonableness and notes that there was overlapping of services in that partners in Keystone were separately represented and *634 that in the instance of one of the bills other very substantial and valuable legal services were included in a larger bill and that the figure set forth above is a partner’s estimate of the amount of the total fee that should be allocated to the litigation here involved. In view of the retention of one of the above law firms as special counsel in the appellate stages, the court also has given consideration to roles thereafter of the other two law firms involved.
After careful study of appropriate factors involved such as time and labor required, nature of services rendered, difficulties of the questions involved and in the speed and progress of the litigation, skill required and responsibilities involved, novelty and complexity of the issues, experience, ability and reputation of counsel, the very valuable rights of and benefits to Keystone which were at risk, time pressures on counsel, and the results obtained, the court finds that a fair and reasonable total charge for allowable legal services is $150,000, which the court, in its discretion, hereby awards, with interest at 6% from January 1, 1968 (which bills were paid sometime after the dates thereof).
During the trial, motions were made upon which decision was then reserved. In its decision above, the court has indicated its answers and rulings on some of such motions. All other motions not so disposed of are now denied.
The court has not marked the proposed findings of fact and conclusions of law which were submitted by both parties. The essential facts and conclusions have been embodied in this decision. The court, however, wishes to express its thanks to counsel for both parties for the preparation and submission of pretrial, trial and posttrial briefs as well as the proposed findings of fact and conclusions of law, all of which have been of great aid and assistance to the court in its determination and findings.