E–SYSTEMS, INC.

v.

The UNITED STATES.

No. 667–81C.

United States Claims Court.

April 8, 1983.

Harold Hoffman, Dallas, Tex., for plaintiff; Gardere & Wynne, Dallas, Tex., of counsel.

R. Anthony McCann, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant; David M. Cohen, Ray Konan and Steve E. Asher, Washington, D.C., of counsel.

## OPINION

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PHILIP R. MILLER, Judge:

### Facts

The complaint in this case claims just compensation under the Fifth Amendment to the Constitution, for the taking of plaintiff's property, consisting of possessory liens on two aircraft owned by the Islamic Republic of Iran. The complaint asserts the taking resulted from the blocking of assets in the United States in which the Iranian government had an interest, after plaintiff had acquired its liens, and from the subsequent failure of the Treasury Department's Office of Foreign Assets Control (OFAC) to issue a license to plaintiff to foreclose its liens on the aircraft.

Plaintiff alleges that in December 1976 it entered into a contract with the Government of Iran to furnish goods and services to repair, modify and improve two Boeing 707 aircraft owned by Iran. Plaintiff alleges that it acquired the necessary supplies and equipment for incorporation into the aircraft and performed the work contracted for, at its premises in Hunt County, Texas, until 1979, when Iran defaulted on its contractual obligation by failing to make payments due for work performed on the aircraft from November 1978 through April 1979. As a result, plaintiff alleges, under Texas law it has possessory liens on the aircraft and is entitled to foreclose them non-judicially to secure satisfaction of its debts.

On November 14, 1979, in response to the seizure of the United States Embassy in Teheran, Iran, and the taking of its personnel as hostages, the President of the United States, acting pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701 (Supp. II 1978), declared a national emergency, blocked the transfer of all Iranian property and interests in property subject to the jurisdiction of the United States and authorized the Secretary of the Treasury to promulgate regulations carrying out the blocking order. Executive Order No. 12170, 3 C.F.R. 457 (1980) and note following 50 U.S.C. § 1701 Supp. III 1979). On November 15, 1979, the Secretary issued Iranian Asset Control Regulations, 31 C.F.R. Part 535 (1980), which provide, *inter alia,* that "[u]nless licensed or authorized [by the Secretary of the Treasury] any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property in which on or since [November 14, 1979] there existed an interest of Iran." 31

C.F.R. § 535.203(e) (1980). *See also* 31 C.F.R. § 535.208(b) (1981).

On January 19, 1981, the governments of the United States and Iran entered into an overall agreement for the release of the American hostages and the settlement of claims. Under the heading "General Principles" the agreement states that it is the purpose of both parties "to terminate all litigation as between the Government of each party and the nationals of the other, and to bring about the settlement and termination of all such claims through binding arbitration." The United States agreed to terminate all legal proceedings in the United States courts involving claims of United States persons against Iran, to nullify all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration. In addition, the United States agreed to bring about the transfer to Iran of all Iranian assets held by United States banks and, "subject to the provisions of U.S. law applicable prior to November 14, 1979," to arrange for the transfer to Iran of all other Iranian properties located in the United States. However, one billion dollars is to remain in an escrow account for the purpose of securing payment of claims against Iran pursuant to the awards of an international arbitral tribunal, which account is to be replenished by Iran whenever the balance falls below $500 million.

Under the agreement the international arbitral tribunal, designated the Iran-United States Claims Tribunal (the Tribunal), is to consist of at least nine members, one-third to be appointed by each government and the remaining third by mutual agreement of the members. The Tribunal has jurisdiction of claims by nationals of the United States against Iran and nationals of Iran against the United States, arising, *inter alia*, out of debts, contracts and property rights. Any award which the Tribunal may render against either government is to be enforceable against such government in the courts of any nation in accordance with its laws. Claims referred to the Tribunal are, as of the date of filing with the Tribu-

nal, to be considered excluded from the jurisdiction of the courts of both the United States and Iran.

On January 19, 1981, President Carter issued a series of Executive Orders implementing the terms of the agreement. Executive Orders Nos. 12276–12285, 3 C.F.R. 104–118 (1982) and note following 50 U.S.C.A. § 1701 (1982). Among other things these orders revoked all licenses permitting the exercise of any right, power or privilege with regard to Iranian funds, securities or deposits; nullified all non-Iranian interests in assets obtained subsequent to Executive Order No. 12170, *supra*, of November 14, 1979; and directed the turnover of Iranian funds and securities to the Federal Reserve Bank of New York to be held or transferred as directed by the Secretary of the Treasury, and all other properties as directed by the government of Iran.

On February 24, 1981, President Reagan issued Executive Order No. 12294, 3 C.F.R. 139 (1982) and note following 50 U.S.C.A. § 1701 (1982), which "ratified" President Carter's executive order of January 19, 1981. It declared suspended and of no legal effect the litigation in any court in the United States of any claim against Iran which may properly be presented to the Iran-United States Claims Tribunal. The suspension of any such claim terminates if the Tribunal determines that it lacks jurisdiction over it; and a claim is discharged for all purposes when the Tribunal either awards recovery of a fixed amount and it is paid, or determines that no amount is due.

On February 26, 1981, the Treasury amended its Iranian Asset Control Regulations to direct and compel the transfer of all blocked Iranian property to Iran. However, an exception was provided for "contested" properties and properties subject to payment by Iran of necessary obligations, charges and fees and discharge of liens against them. 31 C.F.R. §§ 535.215, 535.-333(a), (b) (1982). In view of the exception the regulations did not require E-Systems to transfer the aircraft to Iran or to relinquish its lien. However, Regulations 31

C.F.R. §§ 535.201 and 535.203(e) still require plaintiff to obtain a license from the Treasury in order to foreclose its lien or to transfer the aircraft.

Plaintiff alleges that on December 5, 1979, it filed suit against the Islamic Republic of Iran in the United States District Court for the Northern District of Texas to recover a sum in excess of $15,000,000 for work performed, loss of profits, consequential damages and other relief, but Iran contested jurisdiction. The clerk of the district court reports that on January 12, 1982, the court entered an order suspending further prosecution, for the reason that the court was not persuaded that it had jurisdiction, but stating that should the arbitral Tribunal decline jurisdiction the court will consider lifting the order of suspension.

Plaintiff further alleges that on February 4, 1981, it filed a request with the OFAC for a license to sell the two aircraft at a foreclosure sale, pursuant to its liens, to satisfy the sums owed by Iran; that it informed OFAC that the aircraft were rapidly declining in value because the world market for used Boeing 707 aircraft was becoming saturated; that they were deteriorating physically; that the engines would become obsolete by 1985 because of government regulations on their use; and that plaintiff was incurring continuing and substantial expense in protecting, storing, maintaining and insuring the aircraft. However, despite numerous follow-up requests, plaintiff states, OFAC and the Secretary of the Treasury have refused to issue such a license.

In its brief plaintiff asserts that a taking of its security interest occurred when defendant refused to issue a license within a reasonable time after it filed its application therefor. In its complaint plaintiff claims damages attributable to the taking of its interest in the aircraft are in excess of $6,000,000.

In support of its motion for summary judgment defendant makes two major contentions: (I) That there has been no taking by the United States; and (II) That plaintiff's suit is premature.

### Defendant's Contention That There Has Been No Taking

■ In support of its contention that there has been no taking, defendant asserts, first, that the Treasury offered to grant licenses to plaintiff for sale of the aircraft on three different occasions, but plaintiff has not availed itself of such license opportunities. However, defendant's assertions are not supported by affidavit. Further, plaintiff's assistant general counsel, in an affidavit, denies that such offers were ever made and avers that in the only discussions individual Treasury officials had with him as plaintiff's representative on the subject, they proposed unreasonable conditions. Plaintiff also claims that a proposed licensing policy promulgated by the Treasury on July 22, 1982 (47 Fed.Reg. 31682 (1982)) not only requires as a condition that plaintiff enter into an indemnification agreement in an amount 50 percent in excess of the value of the aircraft, but also that it was issued after the value of the aircraft had been destroyed by unreasonable delay.

In its reply brief defendant now concedes that "whether a license was ever tendered is a fact issue and for purposes of summary judgment only the Government will admit that a license was never tendered." Thus, the foregoing assertions by defendant cannot be an appropriate basis for summary judgment in its favor.

■ Second, defendant seems to argue that if the taking of plaintiff's property is in the lawful exercise of the President's power to conduct foreign policy, the taking of plaintiff's property is not compensable. No case cited by defendant supports such a proposition; and by implication at least, the following are to the contrary: *Dames & Moore v. Regan,* 453 U.S. 654, 689, 101 S.Ct. 2972, 2992, 69 L.Ed.2d 918 (1981); *Russian Volunteer Fleet v. United States,* 282 U.S. 481, 492, 51 S.Ct. 229, 232, 75 L.Ed. 473 (1931); *American Int'l Group, Inc. v. Islamic Republic of Iran,* 657 F.2d 430, 447 (D.C. Cir.1981); *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Authority,* 651 F.2d

800, 814–15 (1st Cir.1981); *Hidalgo County Water Control & Improvement District v. Hedrick,* 226 F.2d 1, 6 (5th Cir.1955). Indeed, it is a prerequisite for a taking to be compensable under the Fifth Amendment that the action be pursuant to the exercise of lawful authority of some kind delegated to the executive. *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 127 n. 16, 95 S.Ct. 335, 350 n. 16, 42 L.Ed.2d 320 (1974); *Pauley Petroleum, Inc. v. United States,* 219 Ct.Cl. 24, 56, 591 F.2d 1308, 1326, *cert. denied,* 444 U.S. 898, 100 S.Ct. 206, 62 L.Ed.2d 133 (1979). "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). · There is no more persuasive reason why this should not apply in achieving a national purpose or benefit in the field of foreign policy than in the accomplishment of any other lawful national purpose or benefit.

Third, defendant contends that a line of federal court cases holding that the block.ing or freezing of assets is not a taking of property refutes plaintiff's claim that the failure of the Treasury to license its foreclosure of possessory liens against blocked Iranian aircraft constitutes a taking of its property for public use without compensation. The cases to which defendant refers are *Tran Qui Than v. Regan,* 658 F.2d 1296 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 487, 74 L.Ed.2d 630 (1982); *Sardino v. Federal Reserve Bank of New York,* 361 F.2d 106 (2d Cir.1966), *cert. denied,* 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966); and *Nielsen v. Secretary of the Treasury,* 424 F.2d 833 (D.C.Cir.1970).

Defendant's reliance upon these cases for summary judgment is, however, not well founded. They all deal with the blocking or freezing of the assets of nationals of enemy or hostile governments and not with the destruction of the property of United States citizens or United States corporations, as claimed by plaintiff herein. In *Tran Qui Than v. Regan, supra,* the Ninth Circuit held that the blocking of funds owed to a corporate bank domiciled in Viet Nam, ruled by a hostile government, pursuant to the Trading with the Enemy Act [1], was not an unconstitutional taking of the property of a refugee resident alien who had been a stockholder of the bank prior to the fall of the South Vietnamese government. The court merely declined to disregard the corporate entity. In sustaining the constitutionality of the blocking action against the corporation, the court relied on the rationale of *Propper v. Clark,* 337 U.S. 472, 481, 69 S.Ct. 1333, 1339, 93 L.Ed. 1480 (1949), which stated that the nation could properly "deprive enemies, actual or potential, of the opportunity to secure advantages to themselves or to perpetrate wrongs against the United States or its citizens through the use of assets that happened to be in this country," even though it necessitated some inconvenience to individuals not involved in any actions adverse to the nation's interest. *Propper v. Clark, supra,* 337 U.S. at 484, 69 S.Ct. at 1340, also pointed out that it was a proper function of a freezing order, prior to vesting, to immobilize the assets covered by its terms "so that title to them might not shift from person to person, except by license, until the Government could determine whether those assets were needed for prosecution of the threatened war or to compensate our citizens or ourselves for the damages done by the governments of the nationals affected." *Propper v. Clark, supra,* in turn relied on the holding in *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 11, 47 S.Ct. 1, 4, 71 L.Ed. 131 (1926), that where the property of nationals of a hostile government is involved, there is no constitutional prohibition against confiscation without any compensation to the owners.

The court in *Tran Qui Than, supra,* 658 F.2d at 1304–05, also pointed out that it was not unreasonable to assume that the assets

---

1. 50 U.S.C.App. § 5(b) (1976).

of the bank corporation were assets in which the Provisional Revolutionary Government of Vietnam (P.R.G.) had an interest; that the blocking action could prevent the P.R.G. from acquiring dollars; that the funds could be used to compensate U.S. citizens for injuries occasioned them by the P.R.G.; and that the blocked funds could be used by the United States as a negotiating tool. The Ninth Circuit further noted that the deprivation was only temporary, since the blocking merely prohibited transfer and did not vest title in the government. 658 F.2d at 1304. Here summary judgment in favor of defendant would bar plaintiff from proving its claim that the denial of a license to sell its security resulted in the almost total destruction of its property.

In *Sardino, supra,* the Second Circuit rejected the claim of a Cuban national residing in Havana to a savings account in a New York bank, representing the proceeds of a life insurance policy on the life of his son, because assets of Cuban nationals had been frozen in 1963 by regulations pursuant to the Trading with the Enemy Act. In holding that there was no unconstitutional taking without just compensation, the court read *Propper v. Clark, supra,* to mean that not only could our government immobilize the assets of foreign nationals by a freezing order until our government could determine whether or not they were needed to compensate our citizens or ourselves for the damages done by the government of the nationals affected, but also "that if Congress should ultimately choose to apply the blocked assets of Cuban nationals to that purpose, the Fifth Amendment would not stand in its way." (*Sardino, supra,* 361 F.2d at 113.) This decision likewise has no bearing on the right to compensation of a U.S. national for the taking of his property by the United States.

Nor does *Nielsen v. Secretary of the Treasury, supra,* support defendant's claim for summary judgment. There the D.C. Circuit held that the blocking of sums deposited in a U.S. bank and owing to a Cuban corporation did not constitute a Constitutional taking of the proportionate shares of those stockholders of the corporation who were Cuban refugees and resided in friendly countries other than the United States. The court ruled that such stockholders had no constitutional right to have the government disregard the corporate entity on their behalf, even though the government had done so for the benefit of those stockholders who were U.S. nationals. The court noted, however, that, even with respect to non-resident aliens, such as the claimants, if the limitation on use of the frozen property is "extensive in impact, and indefinite in duration" or "if continued indefinitely" it may be equivalent to a taking, and that the reasonableness of the particular limitation on use may not be determined from the bare pleadings on a dispositive motion. *Nielsen v. Secretary of the Treasury, supra,* 424 F.2d at 843, 844.

■ Defendant also argues that plaintiff's damages should not be compensable because the government did not directly appropriate plaintiff's property for its own use. However, it is not a prerequisite to an appropriation that the government take physical possession of the property to the exclusion of the plaintiff. In *Benenson v. United States,* 212 Ct.Cl. 375, 388, 548 F.2d 939, 947 (1977), the Court of Claims reiterated Justice Holmes' classic formulation in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), that even in the exercise of the government's police power "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking," and it then added that—

> Subsequent decisions by the Supreme Court, by this court, and by other courts have reaffirmed the principle that the Government's interference with the owner's use of his property may be so substantial and burdensome that a constitutional taking is implied. *United States v. General Motors Corporation,* 323 U.S. 373 [65 S.Ct. 357, 89 L.Ed. 311] (1945); *United States v. Central Eureka Mining Co.,* 357 U.S. 155 [78 S.Ct. 1097, 2 L.Ed.2d 1228] (1958); *Bydlon v. United States,*

146 Ct.Cl. 764, 175 F.Supp. 891 (1959); *Eyherabide v. United States,* 170 Ct.Cl. 598, 345 F.2d 565 (1965); *Brown v. Tahoe Regional Planning Agency,* 385 F.Supp. 1128 (D.Nev.1973), and *Keystone Associates v. State of New York* [82 Misc.2d 620] 371 N.Y.S.2d 814 (1975).

In *Benenson* the court found there had been a taking of the Willard Hotel building in Washington, D.C., because, although both government officials and the hotel owners recognized that it was not economically feasible to restore and operate the building as a hotel or other business property, at the same time the officials barred the owners from removing the building facade to enable investigation of what could be done with the structure economically, and from demolishing and using the site for other purposes. The court explained (212 Ct.Cl. at 389, 548 F.2d at 947):

> The net effect of the acts of the Government is that plaintiffs cannot use their property for any income-producing purpose; they cannot sell it and thus far, the lack of Congressional appropriations has denied them compensation for it. * * * [T]he property lacks a viable economic use and has in fact a negative market value.

And *compare also Louisville Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935); *Drakes Bay Land Co. v. United States,* 191 Ct.Cl. 389, 411, 424 F.2d 574, 586 (1970); and *Laney v. United States,* 228 Ct.Cl. 519, 661 F.2d 145 (1981).

To entitle defendant to summary judgment it must establish that the restrictions placed by defendant on plaintiff's use of its security interest were insufficient to deprive the latter of substantially all economic value. However, although plaintiff has made a showing by affidavit that it has been deprived of such value, defendant has failed to refute it.

Defendant further argues that there was no taking under the Fifth Amendment as a matter of law because plaintiff's injury was merely consequential damage indirectly incident to the exercise of lawful governmental powers.

Black's Law Dictionary (Rev. Fourth Ed.) (1968) defines "consequential damages" as—

> Such damage, loss, or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act.

And it also states that—

> The term means sometimes damage which is so remote as not to be actionable * * *.

Webster's Third New International Dictionary (Unabridged) (1976) defines "consequential damages" as—

> the damages that do not arise as an immediate or natural and probable result of the act of the party but are an incidental result of it and are generally not recoverable because remote * * *.

The facts of the principal cases which defendant cites expositive of merely consequential injury are far removed from the facts herein. In *Omnia Commercial Co. v. United States,* 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923), the government's requisition of the entire production of a steel manufacturer for the year 1918, which made it impossible for the manufacturer to produce steel for others, was held not to be a taking of a customer's property in its contract with the steel company. In *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958), a 1942 War Production Board order that non-essential gold mines be temporarily closed down so as to enable the use of mining personnel and machinery in more essential mining operations during wartime was ruled not to be a taking of a gold mine merely because the order deprived the owner of the opportunity for profit. In *Kearney & Trecker Corp. v. United States,* 231 Ct.Cl. ——, 688 F.2d 780 (1982), the plaintiff had a subcontract for the delivery of a machine to a defense contractor. During 1980, as authorized by the Defense Production Act of 1950 (50 U.S.C.App. §§ 2061 *et seq.*), the government required the plaintiff to accelerate production and delivery of the machine. To accomplish this plaintiff in fact delivered to the government a machine

that it had produced for another customer not engaged in defense production. After the other customer cancelled its contract, plaintiff claimed compensation from the government for the value of the second contract on the theory that the government had appropriated it. In holding for the government, the court reasoned that the facts resembled those in *Omnia,* in that the government did not appropriate the contract but only made it impossible to perform it and that plaintiff's lost profits were merely consequential damages.

The cited cases do not establish that, as a matter of law, plaintiff is not entitled to recover. Plaintiff claims that it was deprived of the value of its security interest because the defendant has prohibited it from foreclosing on its lien and from transferring the property subject to the lien, and that like governmental action was held to be a taking of the lienholder's property in *Louisville Bank v. Radford, supra.* It states that it applied for a license to sell the aircraft in February 1981 and at that time informed defendant that the value of the property was deteriorating, but that 2 years after the application, during which the aircraft have become substantially worthless, defendant has still not issued the license. If plaintiff's security has lost all substantial economic value during the interim period, it is not apparent why its loss is remote or incidental rather than a direct result of defendant's action or inaction after defendant was warned of such consequence.

### Defendant's Contention that the Action is Premature

■ Defendant contends that plaintiff's claims for damages in the Claims Court are not ripe for review because plaintiff has yet suffered no injury—in that an avenue exists by which plaintiff may be able to recover 100 percent of its claims, namely the Iran-United States Claims Tribunal. It argues that the executive agreement and orders merely substitute one remedy (arbitra-

tion award) for another (non-judicial sale of security), and that until plaintiff has exhausted the substituted remedy without avail, it may not properly claim a loss of its property. Defendant states, and plaintiff does not deny, that plaintiff has already filed a claim with the Tribunal for damages for Iran's breach of its contract to pay for the repair and modification of the two aircraft.

On the other hand, plaintiff claims that its liens are property independent of the debts they secure and that depriving them of their enforceability takes plaintiff's property and requires just compensation under the Fifth Amendment irrespective of plaintiff's retention of its right to sue on the underlying claim. *Armstrong v. United States, supra; Louisville Bank v. Radford, supra.* It says that its liens included the right to sale without having to resort to judicial proceedings; that the proceedings before the Tribunal will be time-consuming, delayed and expensive; that claims totalling more than $4 billion have already been filed with the Tribunal; and that the ability and willingness of the government of Iran to carry out its promise to replenish the $1 billion fund to pay judgments of the Tribunal in excess of the initial total are problematic.

■ Defendant's arguments are the more persuasive. Even if plaintiff's liens are property independent of the claims secured by the liens, plaintiff may still not suffer a loss if in fact the claims are paid. As for the delays, even where a property owner receives just compensation as a result of a Tucker Act suit in this court,[2] frequently long periods of time elapse between the taking and the payment. Compensation for the delay is payable as part of the damages in the form of interest. *Albrecht v. United States,* 329 U.S. 599, 602, 67 S.Ct. 606, 608, 91 L.Ed. 532 (1947); *Miller v. United States,* 223 Ct.Cl. 352, 399, 620 F.2d 812, 837 (1980). Plaintiff cannot be sure that the Tribunal will not measure its award in the same

---

**2.** 28 U.S.C. § 1491, *as amended by* section 133(a) of the Federal Courts Improvement Act of 1982, Pub.L. 97–164, 96 Stat. 25, 39–40.

manner. In any event, if it does not, plaintiff may still sue in this court for any constitutional shortfall.

According to plaintiff's complaint, E-Systems' claims against Iran total some $15 million, while the value of the security has been at most $6 million. Absent the opportunity to resort to the arbitration Tribunal and the billion dollar replenishable fund set aside by Iran for such purpose pursuant to the Iran-United States agreement, plaintiff might well be without any effective remedy to collect the $9 million deficiency even if its claims are wholly valid. Thus plaintiff is not yet in a position to establish that it has not received a *quid pro quo* for the restriction on the execution on its liens.

Equally important, if the President was authorized to enter into the agreement with Iran and to issue his executive orders to effectuate it, and if plaintiff retains the ultimate right to sue in this court for any deficiency in the just compensation to which it is entitled, it may not disregard the requirement that it first present its claim to the international Tribunal.

*Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) provides some guidance with respect to the validity of a requirement that a claimant for just compensation first exhaust his remedies before a special tribunal. There, as a comprehensive solution to a national rail crisis precipitated by the entry into reorganization proceedings under § 77 of the Bankruptcy Act of eight major railroads, Congress enacted the Regional Rail Reorganization Act of 1973 (Rail Act). The Rail Act, *inter alia,* established a government corporation, the United States Railway Association (USRA), and directed it to formulate a Final System Plan by July 1975 for restructuring the railroads into a financially self-sustaining rail service, pursuant to which designated railroad properties were to be transferred to the Consolidated Rail Corporation (Conrail), a private corporation, in return for Conrail securities plus USRA obligations. The Act set up a new Special Court with exclusive jurisdiction of all proceedings concerning the Plan. With-

in 10 days after deposit with it of the Conrail securities and USRA obligations, the Special Court was to order the railroad trustee to convey forthwith to Conrail the railroad properties designated in the Plan and to determine only thereafter whether the compensation for the conveyance was more fair and equitable than the constitutional minimum, or else order the issuance of additional Conrail securities and USRA obligations. Parties with various interests in the Penn Central Railroad brought suits attacking the constitutionality of the Rail Act, contending that the Act violated the Fifth Amendment by taking their interest in the Penn Central property without just compensation, on the grounds: (1) that the Conrail securities and USRA obligations would not be the constitutional equivalent of the rail properties required to be conveyed; and (2) that the compelled continuance of rail operations at a loss pending the Plan's implementation of the reorganization Plan was taking by erosion.

The Supreme Court held that, despite the government's concession that there was no assurance that the Plan could be implemented within a reasonable time, the ultimate availability of the Tucker Act remedy, allowing suit in the Court of Claims for any deficiency in just compensation, barred any determination that the Rail Act was unconstitutional as allowing a taking without just compensation. It stated (419 U.S. at 148–49, 95 S.Ct. at 361):

The Rail Act authorizes inclusion in the Final System Plan of different kinds of consideration in exchange for the rail properties, subject to adjustment by the Special Court to assure fairness and equity. Congress fully expected that this consideration would provide the minimum compensation required by the Constitution; it wished to provide no more. If, however, that hopeful expectation should not be fulfilled, and the consideration exchanged for the rail properties should prove to be less than the constitutional minimum, the Tucker Act will be available as the jurisdictional basis for a suit in the Court of Claims for a cash award to cover any constitutional shortfall.

\* \* \* \* \* \*

It is argued, however, that, even if a Tucker Act remedy remains open, the remedy is inadequate because it fails to cure basic deficiencies in the conveyance provisions of the Rail Act. We hold, to the contrary, that while the conveyance provisions of the Rail Act might raise serious constitutional questions if a Tucker Act suit were precluded, the availability of the Tucker Act guarantees an adequate remedy at law for any taking which might occur as a result of the final-conveyance provisions. Further, with the Tucker Act remedy, the payment of "fair and equitable consideration" in compliance with the reorganization statutes is assured, and procedural due process is satisfied. [Footnote omitted.]

To the argument that the Tucker Act remedy was inadequate to provide just compensation because payment would be delayed until long after the erosion taking and the conveyance taking had taken place, the court responded with respect to both takings (419 U.S. at 149 n. 35, 95 S.Ct. at 361 n. 35):

We reject as well the suggestion that a Tucker Act remedy comes too late. * * * Interest on a just-compensation award runs from the date of the taking.

And it further stated (419 U.S. at 156, 95 S.Ct. at 365):

[T]he procedural sequence is vital to accomplishing the goals of the Act. If judicial review of the terms of the transfer was required before the conveyance could occur, the conveyance might well come too late to resolve the rail transportation crisis. As long as creditors are assured fair value, with interest, for their properties, the Constitution requires nothing more.

Subsequent to the decision in the *Regional Rail Reorganization Act Cases,* two of the railroad security holders brought suit in the Court of Claims for just compensation for the forced conveyance of their bonds to Conrail. In each case the court granted the government's motion for an indefinite stay until the Special Court ordered distribution of the securities and the certificates of value and compensation, citing as its primary reasons "judicial economy and the fact that this entire action is premature." *Shovlin v. United States,* 212 Ct.Cl. 550 (1976); *Trainer v. United States,* 212 Ct.Cl. 551 (1976).

Long prior to the cases under the Rail Act the Supreme Court held that a provision of the Revenue Act of 1926, which authorized the Commissioner of Internal Revenue to assess and collect summarily the liability of a delinquent taxpayer from a transferee of his assets without any prior hearing, did not violate the Constitution as long as adequate opportunity was afforded for a later judicial determination of legal rights. *Phillips v. Commissioner,* 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931). The court explained (pp. 596–97, 51 S.Ct. at 611–12):

Where only property rights are involved, mere postponement of the judicial inquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate. * * * Delay in the judicial determination of property rights is not uncommon where it is essential that governmental needs be immediately satisfied.

The constitutional validity of the requirement that the owner of a blocked attachment or other security interest in Iranian assets first exhaust his claim before the Iran-United States Claims Tribunal before seeking a judgment against the United States under the Tucker Act for its nullification has been upheld by two circuit courts of appeal. *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Authority,* 651 F.2d 800 (1st Cir.1981); and *American Int'l Group, Inc. v. Islamic Republic of Iran,* 657 F.2d 430 (D.C.Cir.1981).

In the first case, Main, pursuant to contract, had performed engineering and consulting services for but had not been paid by various Iranian governmental entities prior to the seizure of the American hostages. After the issuance on November 14, 1979, of the order blocking Iranian assets, plaintiff sought and, on November 20, 1979, received from OFAC a license to obtain

injunctive relief and attachments against Iranian assets, but not including the authority to proceed to judgment on its claims or to receive any payment from the blocked assets. Thereupon plaintiff brought suit against the government of Iran and its entities in the U.S. District Court for the District of Massachusetts. After the district court issued a preliminary injunction enjoining the defendants from disposing of any of their assets in the United States and defendant appealed the order, proceedings were stayed pending the outcome of ongoing negotiations for the release of the American hostages. After the release of the hostages and the execution of the agreement with Iran on January 19, 1981, obligating the United States to terminate all legal proceedings in U.S. courts against Iran and to bring about the termination of such claims through binding arbitration by the Iran-United States Claims Tribunal, on February 4, 1981, Main brought suit in the same district court against the United States seeking a declaration that the executive agreement with Iran and the implementing executive orders and Treasury regulations were in excess of the President's constitutional and statutory authority. In the alternative, Main sought a declaration that the agreement effected a "taking" of its property for public use without just compensation. The district court upheld the validity of the President's action and dismissed the complaint against the United States; and it also dissolved the preliminary injunction against Iran and vacated the attachments against the Iranian assets.

The Court of Appeals held that the President had authority to settle Main's claims against the Iranian defendants by providing for their submission to binding arbitration and that therefore they were no longer cognizable by the courts. With respect to Main's claim against the United States, it reasoned (651 F.2d at 814–15):

> Main argues that it is at least entitled to compensation from the United States as a result of the President's actions in settling the claims. We think, however, this issue is neither properly presented nor ripe for review.

There may well be situations when the President's extinction or "settlement" of a claim against a foreign government, without the consent of the claimant, would constitute a "taking" of private property for a public "use." *See* U.S. Const., Amend. V. Here, of course, the President has not simply "extinguished" Main's claim, but has provided alternative means for its resolution and satisfaction. Thus, his actions could at very most constitute a "taking" of property only if the alternative method of satisfying the claim (*i.e.,* submission to the Tribunal) is demonstrably and measurably inferior to the rights otherwise available to Main (*i.e.,* the right to attempt to obtain an unsecured judgment in the federal court). Yet, at present, it would be impossible to say with assurance whether the President has substituted a "lesser" remedy for a "greater," or vice versa.

To be sure, arbitration before the Tribunal poses, from Main's perspective, certain obvious disadvantages. Main might fear that a panel composed partly of Iranians will approach Main's claims with less sympathy than might a United States district court. The Tribunal could become stalled in procedural wrangles. On the other hand, there may, in fact, be some advantages to the arbitration process. Iran will be unable to present sovereign immunity or act of state defenses, and thus, at the least, potentially troublesome pre-trial skirmishes will be avoided. Main will also derive some protection from a $1 billion security account, although it maintains this security represents only a fraction of all claims and thus may be inadequate. The Declarations also provide that Tribunal awards will be enforceable in any country in accordance with its laws. Thus, even should the security account prove insufficient, the Tribunal award may nevertheless be more valuable, in terms of enforcement abroad, than an equivalent unsecured United States court judgment. And, of course, the amount the Tribunal will award Main on its claim is at present uncertain.

Not only is Main's claim for compensation, at this point, wholly speculative, it is (unless "not exceeding $10,000 in amount") made before the wrong tribunal. *See* 28 U.S.C. §§ 1346, 1491 & 2201. If and when Main can establish a "taking" for which compensation is due, its remedy will lie in the Court of Claims. [Footnotes omitted.]

Accordingly, it affirmed the dismissal of the complaint against the United States.

In *American Int'l Group, Inc. v. Islamic Republic of Iran, supra,* subsequent to the initial freezing of Iranian assets but prior to the settlement agreement with Iran, several American corporations brought suit against Iran in a U.S. district court claiming damages for the nationalization of their enterprises in Iran and obtained district court orders attaching various Iranian owned assets in the United States. Interlocutory appeals were then taken from liability decisions against Iran and from the attachment orders. While the cases were pending in the Court of Appeals, the executive agreement between the United States and Iran, suspending pending cases against Iran and requiring the claims to be submitted to the arbitration Tribunal, was reached. At issue in the Court of Appeals was whether or not the President was authorized by statute or by the Constitution to enter into the agreement to vacate the attachments and to suspend the claims, and if so whether the claimants had a right to just compensation therefor.

The court upheld the authority of the President to suspend the claims and void the attachments, but found it unnecessary to decide whether or not the executive's settlement of private claims by referring them to the arbitration Tribunal was a taking, because (657 F.2d at 447)—

the applicability of the Taking Clause to the claims suspension is an issue not yet ripe for review * * *. [Footnote omitted.]

[W]e do not have any assurance that the claimants will suffer any loss. Although their claims for judicial relief have been suspended, they have been remitted to a forum apparently capable of granting meaningful relief. There are a number of possible outcomes. Some claimants may prevail before the arbitration panel and thus incur no loss. Others who either do not succeed of the merits or perhaps are unable to satisfy their awards may proceed along one of two routes: (1) they may attempt to seek relief from the stay and revival of their claims or (2) they may attempt to seek relief from the United States before the Court of Claims under the Tucker Act, 28 U.S.C. §§ 1491, 1502 (1976).

\*   \*   \*   \*   \*   \*

We have no reason to believe that the $1 billion security fund will not cover all meritorious claims. We have no reason to believe that the Iranians will not replenish the fund as they have agreed to do. We have no reason to believe that if they do not replenish the fund, then the prevailing claimants will be unable to obtain worldwide enforcement of any award according to the terms of the declarations. Finally, and by no means of least importance, we have no assurance that the appellees' claims are meritorious, and thus that executive action has taken anything of value.

The court then remanded the cases to the district court and directed that the proceedings against the United States be stayed pending the completion of the arbitration proceeding before the international Tribunal, noting (657 F.2d at 448):

Before the doors of the court are forever closed to these appellees and those similarly situated, we presume that they will be able to argue that such relief as may be realized through arbitration has failed to make them whole and therefore that dismissal of their claims would constitute a compensable taking. At that time the District Court will be able to determine whether any taking has in fact occurred and, if so, what should be done.

Finally, the same issues were raised in the Supreme Court in *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). There the petitioners,

in December 1979, had filed suit in a federal district court against the government of Iran and other Iranian governmental entities for moneys owed them for services performed under a contract and had obtained attachment orders against the defendants' property in the United States. In May 1981 the district court granted summary judgment for the petitioners, but then it stayed execution of its judgment pending appeal, and vacated all prejudgment attachments obtained against the Iranian defendants in light of the executive orders of January and February 1981. Meanwhile, in April 1981, Dames & Moore filed an action for declaratory and injunctive relief against the United States and the Secretary of the Treasury seeking to prevent enforcement of the executive orders and regulations implementing the agreement with Iran, alleging that such actions were unconstitutional to the extent they adversely affected petitioner's judgment against the government of Iran and its entities. Following the decisions in *Main* and *American Int'l Group, Inc., supra,* upholding the President's authority to issue the executive orders and regulations challenged by the petitioner, the district court dismissed the petitioner's complaint for failure to state a claim upon which relief could be granted.

The Supreme Court [3] likewise upheld the President's authority to enter into the agreement with Iran and to issue the challenged executive orders and regulation as falling within his implied constitutional power to settle mutual claims between a foreign government and the United States "where * * * the settlement of claims has been determined to be a necessary incident to the resolution of a major foreign policy dispute between our country and another, and where, as here, we can conclude that Congress acquiesced in the President's action." (453 U.S. at 688, 101 S.Ct. at 2991.) In response to the petitioner's contention that the suspension of its claims and attachments against Iranian property caused it to suffer an unconstitutional taking, the Court

stated that the possibility of such a taking would depend upon whether there was at the time of taking "reasonable, certain and adequate provision for obtaining compensation", and this made ripe for adjudication whether the petitioner would have a remedy at law in the Court of Claims under the Tucker Act. It saw "no jurisdictional obstacle to an appropriate action in the United States Court of Claims under the Tucker Act." (453 U.S. at 689–90, 101 S.Ct. at 2992.) However, it held that it was premature to address the merits of such a claim because (453 U.S. at 688–89, 101 S.Ct. at 2991–92):

We do not think it appropriate at the present time to address petitioner's contention that the suspension of claims, if authorized, would constitute a taking of property in violation of the Fifth Amendment to the United States Constitution in the absence of just compensation.[14] Both petitioner and the Government concede that the question whether the suspension of the claims constitutes a taking is not ripe for review. * * * Accord, *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Authority, supra,* at 814–815; *American Int'l Group, Inc. v. Islamic Republic of Iran,* 211 U.S.App.D.C., at 485, 657 F.2d at 447.

---

[14] Though we conclude that the President has settled petitioner's claims against Iran, we do not suggest that the settlement has terminated petitioner's possible taking claim against the United States. We express no views on petitioner's claims that it has suffered a taking.

Although the Supreme Court was spared the need for deciding the issue by the concession of the parties that the question of whether or not there had been a taking was not yet ripe for review, it is plain that the concession was justified. For as the Court itself stated in a prior portion of its opinion dealing with the President's actions as a settlement of international claims (453 U.S. at 686–87, 101 S.Ct. at 2990–91)—

---

**3.** Although the plaintiffs' appeal was docketed in the Court of Appeals for the Ninth Circuit, because of the importance of the issue the

Supreme Court granted certiorari before judgment of the circuit court. *Dames & Moore, supra,* 453 U.S. at 667–68, 101 S.Ct. at 2980–81.

Our conclusion is buttressed by the fact that the means chosen by the President to settle the claims of American nationals provided an alternative forum, the Claims Tribunal, which is capable of providing meaningful relief. * * * The fact that the President has provided such a forum here means that the claimants are receiving something in return for the suspension of their claims, namely, access to an international tribunal before which they may well recover something on their claims.

### Conclusion

Although plaintiff's claim for just compensation has not yet matured, since the court has jurisdiction of the claim and it is not clear what is the starting date for the statutory period of limitations, the complaint will not be dismissed but proceedings thereon will only be suspended pending the final disposition of plaintiff's claim against Iran via the Tribunal. *Cf. American Int'l Group, Inc. v. Islamic Republic of Iran, supra,* 657 F.2d at 448–49; *Shovlin v. United States, supra,* and *Trainer v. United States, supra.*

For the reasons discussed, defendant's motion for summary judgment is denied. However, IT IS ORDERED:

(1) That proceedings in this case are suspended until the Iran-United States Claims Tribunal either determines that it lacks jurisdiction of plaintiff's claim, or awards recovery of a fixed amount and it is paid, or determines that no amount is due.

(2) That within 30 days of the termination of the suspension of proceedings, as set forth above, plaintiff shall file with the clerk an original and four copies of a notice indicating whether or not further proceedings before the court are deemed required, and, if so, what those proceedings should be. A copy of such notice shall be served on defendant in conformity with Rule 5. Defendant shall have 28 days to file a response and plaintiff will have 14 days to reply. Thereafter the court will issue such order as may be deemed appropriate.

(3) That plaintiff's attorney of record shall report to the court the status of proceedings before the Tribunal at intervals of 90 days or less beginning with the date of this order.

(4) Plaintiff may also file a motion to terminate the suspension if the Tribunal fails to proceed on plaintiff's claim in good faith, if plaintiff is not paid within a reasonable time of an award in its favor, or for other good cause shown.