Keating, J.
In the early part of this year the Metropolitan Opera Association (the Association) vacated the building it had used for over 83 years and moved to a new building in the Lincoln Center for the Performing Arts.
The Association, prior to its departure, entered into a 50-year lease with the plaintiff, Keystone Associates Incorporated, under the terms of which Keystone was to demolish the building and erect thereon a 40-story office building. The new building was to become the property of the Association and Keystone would pay a yearly rental fee. This rental fee totalled $200,000 for the first four years and amounts graduated upward thereafter to comprise an average annual rental of $484,000. In addition, Keystone undertook to assume the burden of all taxes, insurance, maintenance and operating costs from the date on which possession was delivered. The lease also required that demolition commence within six months after possession was taken by the lessee, and that $1,000,000 be posted as security for the performance of the contract.
On May 10, 1966 possession of the property was delivered to Keystone after all usable stage and lighting equipment had been removed to the new opera house. On May 16, 1966, Keystone filed a written notice and application for a permit to demolish the building. On the same date the statute here in question was enacted.
The Legislature declared that it would serve the “recreational and cultural needs of the citizens of this state ’ ’ if the old building were preserved. To this end it created a private corporation, The Old Met Opera House Corporation (the Corporation), vested it with the power to condemn the property and appropriate it for use as an auditorium in which operas and other musical and cultural events could be held.
It provided in addition that the Superintendent of Buildings of the city could refuse a demolition permit for a period of 180 days upon the request of the trustees of the Corporation and upon the deposit by the trustees of $200,000. This sum was to *86 stand, as security for payment of any damages the owner might suffer in the event no condemnation took place.
Though the statute was passed on the 16th of May it was not signed by the Governor for some six weeks. The $200,000 security was not posted until the 24th of August. In the interim the Buildings Commissioner delayed issuance of the permit so that the Corporation might have a reasonable time to organize and raise funds.
Shortly after the Governor approved the statute, this proceeding to compel issuance of the license was initiated by Keystone. In addition, the Association commenced an action to declare the statute unconstitutional.
Special Term declared the statute to be a taking of the Association’s and Keystone’s (the “ owners”) property during the 180-day period. It found in addition that the $200,000 would be insufficient to cover the damage certain to be suffered by them and that by limiting recovery to that amount the Legislature illegally invaded the judicial province.
The Appellate Division has unanimously affirmed that determination.
The Corporation on this appeal argues that the six-month delay'is a reasonable exercise of the police power; that the interference with the Association’s property is not a taking of property 1 ‘ in the constitutional sense ’ ’ and that, even if it be a taking, just compensation is provided.
It seems perfectly clear that the purpose of this statute is the appropriation of the Association’s and Keystone’s (“ owners ”) property to a public use. It declares that the preservation of the building “will serve the recreational and cultural needs of the citizens of this state ” and specifically empowers the Corporation to obtain the property through purchase or condemnation, “ such condemnation is hereby declared to be for a public purpose.”
The 180-day delay in demolition is authorized solely for the purpose of permitting the Corporation to raise funds to pay for the appropriation. In the meantime, we are told by the trustees of the Corporation, the owners are “ free ” to continue to operate this property as they have in the past—namely as an auditorium for the staging of “ recreational and cultural ” *87 events.* In other words, the owners may continue to use the building for the purpose desired by the Legislature or they can let the building stand idle and suffer the loss. Meanwhile the Corporation will collect the funds necessary to pay for a permanent appropriation.
The statute was clearly not intended to protect the public health, safety, and welfare, as those terms are understood. It may be true that the destruction of the old building will limit the number of auditoriums available for the staging of large scale cultural programs such as operas and ballets. To that extent the public may suffer. But the statute does not contain legislative findings that there is a shortage of such auditoriums and that the continued operation of this auditorium is necessary until others can be built, purchased or condemned. Indeed, the very scheme outlined by the statute runs counter to such a finding.
The Legislature is not willing to invest public funds in order to appropriate the building and it' is perfectly willing to see it demolished in six months if private funds are not forthcoming. No provision is made to guarantee the preservation of the building at the end of the six-month period.
Since this is clearly and explicitly a condemnation statute, the question is to what extent, pending exercise of the power of condemnation, the Legislature may interfere with the rights of property owners to build upon or improve their property.
In Forster v. Scott (136 N. Y. 577) we struck down a statute which provided that, after the Department of Parks filed a map of a proposed street, no compensation was to be made to the owner for any improvements put upon the land during the time between the filing of the map and the condemnation proceeding. Under the statute, it was not certain whether condemnation would in fact take place. “ The validity of a law ”, we wrote (p. 584), “is to be determined by its purpose and its reasonable and practical effect and operation, though enacted under the guise of some general power, which the legislature may lawfully exercise, but which may be and frequently is used in such a *88 manner as to encroach, by design or otherwise, upon the positive restraints of the Constitution. What the legislature cannot do directly, it cannot do indirectly, as the Constitution guards as effectually against insidious approaches as an open and direct attack. Whenever a law deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment, that materially affect its value, without legal process or compensation, it deprives Mm of his property within the meaning of the Constitution. All that is beneficial in property arises from its u,se and the fruits of that use, and whatever deprives a person of them deprives him of all that is desirable or valuable in the title and possession. It is not necessary, in order to render a statute obnoxious to the restraints of the Constitution, that, it must in terms or in effect authorize an actual physical taking of the property or the thing itself, so long as it affects its free use and enjoyment, or the power of disposition at the will of the owner.” (Emphasis added.) We went on (pp. 584-4585) to conclude that the plaintiff, in that case, was “ deprived of the right to build upon his lot by the statute in question, and as this circumstance obviously impaired its value and interfered with his power of disposition, it was to that extent void as to him ’ ’.
The deprivation here, not being incidental to a lawful exercise of the police power, is equally unreasonable and constitutes a taking of property for which just compensation must be paid if the statute is to be upheld (see, also, Miller v. City of Beaver Falls, 368 Pa. 189; State v. Griggs, 89 Ariz. 70 [1960]; Henle v. City of Euclid, 97 Ohio App. 258; Chase v. City of Glen Cove, 41 Misc 2d 889).
The Corporation argues that those cases, though involving similar restrictions, were indefinite in time. This is not entirely true. Griggs involved only a two-year period and the Beaver case a three-year period. In any event, where the restriction itself cannot be justified,, the period of time during which it operates is of no relevance. The longer in duration, the greater the damage is likely to be.
The Corporation contends that if the six-month delay in demolition in fact amounts to a taking, then the $200,000 available provides just compensation. This is not the case.,. The cost of rent and maintenance alone exceeds $113,000: This *89 figure is conceded by the Corporation. In addition, when the property was turned over to Keystone and was no longer to be operated for tax exempt purposes, the property was taken off the tax exempt list and placed on the tax rolls. The taxes alone will exceed $125,000. These amounts do not even include the other damages which Keystone claims it has suffered as a result of the denial of the permit. While some of these claims are dismissed by the Corporation as “speculative,” “incapable of precise definition, ” “ anticipated and not actually incurred, ’ ’ etc., there is little question but that Keystone will suffer damages considerably in excess of the posted security.
In addition, the delay may result in Keystone’s being forced to abandon its lease. Thus, the Association is in danger of being deprived of substantial benefits under the terms of that lease.
Moreover, even if it were not certain that damages would exceed the posted security but merely possible that they would, this statute must fall. Compensation must be sure and certain and “ the property owner cannot be relegated to the doubtful responsibility or solvency of a private corporation or of an individual.” (Brewster v. Rogers Co., 169 N. Y. 73, 81.)
There is no guarantee or even likelihood that this assetless corporation will be able to pay damages in excess of the posted security. Whether the Legislature intended it or not, the practical effect of the statute is to set a limit on the amount of recovery. The law of this State is clear that the determination of just compensation is a judicial function and that the Legislature cannot set the maximum figure on the amount of compensation that will be paid. (See Matter of City of New York [Fifth Ave. Coach Lines], 18 N Y 2d 212, 218.)
In summary, this statute was not one enacted in furtherance of the police power. In constitutes an unreasonable interference with property rights for which the State must provide a sure and certain fund for recovery of the damage which will be suffered. The amount of such fund must be established through the judicial process, not by the Legislature.
The Corporation, in a vain effort to save the statute, has attempted, by a comparison of provisions, to test the constitutionality of the Landmarks Preservation Act of the City of New York. (Local Laws, 1965, No. 46 of City of New York.) We are concerned with the facts of this case and this case alone. *90 It is not necessary, at this time, to enter into a discussion of the Landmarks Preservation Law or any other statute which appears to have been enacted in the exercise of the police power.
The statute here in question constituted an attempt by the Legislature to indulge those citizens — among whom is included the writer of this opinion—who desire the preservation of this grand old building for the staging of opera. However, that purpose may not be achieved by the appropriation of the property of other citizens. If dedication and use for a public purpose is desired, then just compensation must be paid. That is the command of our Constitution,
The order of the Appellate Division should be affirmed, without costs.

 It should be noted that the petitioner Keystone argues that it is impractical, if not impossible, for it to operate the building as a public auditorium as it now stands.