The MONARCH INSURANCE COMPANY OF OHIO, Plaintiff,

v.

The INSURANCE CORPORATION OF IRELAND, .LIMITED and Frelinghuysen Livestock Managers, Inc., Defendants.

The CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, Plaintiff,

v.

The INSURANCE CORPORATION OF IRELAND, LIMITED and Frelinghuysen Livestock Managers, Inc., Defendants.

Nos. 84 Civ. 0871 (RLC), 85 Civ. 1691 (RLC).

United States District Court, S.D. New York.

June 13, 1986.

Rein, Mound & Cotton, New York City, for plaintiffs; Alan John Rein, Wayne R. Glaubinger, of counsel.

Killarney, Fabiani & Brody, New York City, for Frelinghuysen Livestock Managers; John V. Fabiani, Jr., of counsel.

D'Amato & Lynch, New York City, for Ins. Corp. of Ireland; Robert E. Meshel, John P. Higgins, Samuel G. Adler, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Plaintiffs, the Monarch Insurance Company of Ohio ("Monarch") and the Central National Insurance Company of Omaha ("Central") and codefendant, Frelinghuysen Livestock Managers ("FLM") move for their expenses and attorneys' fees as sanctions to be assessed against defendant, Insurance Company of Ireland, Limited ("ICI"), pursuant to Rule 11, F.R.Civ.P. and 28 U.S.C. § 1927.

Rule 11 provides in pertinent part as follows: ".... The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."

The court is directed to require violators to pay the expenses and attorneys' fees of the opposing party incurred in connection with the offending filings.

28 U.S.C. § 1927 imposes similar sanctions on an attorney or party found to have engaged in frivolous or unfounded litigation: "[a]ny attorney ... who ... multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct."

Movants contend that Rule 11 and § 1927 sanctions are mandated because of ICI's interposition of frivolous pleadings and its continued prosecution of frivolous claims. They allege that ICI's counterclaim against plaintiffs and its cross-claim against FLM, which allege that the plaintiffs and FLM conspired to defraud ICI by securing its commitment to the reinsurance policies that were the subject of the litigation, were asserted without any basis in law or fact. They allege that in the futile attempt to prove these unfounded allegations, ICI greatly increased movants expenses in prosecuting and defending against the litigation by requiring them to make unnecessary trips outside the country and to participate in many needless depositions. Even after subjecting them to the wasteful burdens of travel, time and energy movants allege that ICI was unable to prove its fraud and conspiracy contentions which were eventually dismissed by the court at trial.

The litigation was initiated in this court by American Home Assurance Company

("American Home") and the Birmingham Fire Insurance Company of Pennsylvania on December 19, 1983 and docketed as 83 Civ. 9181. The defendants were ICI, RTC Limited ("RTC"), Bloodstock International (Bermuda) Ltd. ("BIBL"), and Underwriters at Lloyds, Secretan Syndicate ("Secretan"). ICI brought into the case as third-party defendants, Rhulen Agency, Inc. ("Rhulen"), Somerset Broking Limited ("Somerset"), Leadenhall, Ltd. ("Leadenhall"), Peter Meredew and John Richard Crawford Harris. Rhulen brought in Paul Napolitan, Inc. as fourth-party defendant.

Frontier Insurance Company ("Frontier") instituted an action in 1984 in the New York State Supreme Court against ICI, Equine & Livestock Insurance Co., Ltd. ("Equine"), Brian D. Sutton, BIBL, Meredew, Harris, RTC and Rhulen. That case was removed to this court and docketed as 84 Civ. 769. Monarch commenced its action on February 6, 1984, docketed as 84 Civ. 871, naming ICI and FLM as defendants. Central began its action against ICI in the District of Nebraska. That suit was dismissed for lack of personal jurisdiction over ICI, and Central instituted litigation here as 85 Civ. 1691 against ICI and FLM.

There were, I believe, four trips abroad—two to London, a third to Bermuda, and a fourth to Guernsey. The need, scope and purpose of each of these trips were discussed and agreed upon at conferences with the court. All concerned counsel were present and participated in these discussions. I cannot recall any complaint that the first trip to London was unnecessary or undertaken for ICI's sole benefit. Indeed, ICI did not stand alone in scheduling the London depositions. American Home arranged the schedule for the various depositions to be taken in London and secured final agreement as to it from all counsel before the departure to London. BIBL and RTC noticed depositions of various parties during this trip for use in establishing their allegations. The court's impression was that the London depositions were considered appropriate by all of the parties, and that each of the parties participated in the questioning of the various witnesses.

ICI paid the expenses of all counsel for a trip to Bermuda undertaken to depose John Richard Crawford Harris. Harris had refused to respond to questions in London but agreed to talk in Bermuda. No complaint about this trip was voiced at the time and it does not appear to be a subject of any complaint in these motions. In any event, as I understand it the Harris depositions in Bermuda were arranged by ICI for the benefit of plaintiffs and other parties whose questions Harris had refused to answer in London.

By the time the second trip to London and the Guernsey trip took place the litigation's shape had altered considerably. Settlements had been reached with some of the plaintiffs, and with all of the third-party and fourth-party defendants. What remained were Monarch's and Central's cases against FLM and ICI. At this point ICI urged the need for the Guernsey depositions to establish the fraudulent conduct of Adolph Vita of FLM and his complicity with Monarch, Central, Meredew, RTC and others in a conspiracy to defraud ICI by obtaining reinsurance through it at discount rates at which FLM, Central and Monarch could profit at ICI's expense. These depositions were challenged, chiefly by FLM, on the ground that ICI's claims were unfounded. This challenge was echoed by Central and Monarch, both taking the view that ICI's contentions were ludicrous and interposed for delay. The trip to London to depose Christopher Durkin, however, was not resisted at the time. The chief concern then voiced by the plaintiffs was that ICI should schedule these depositions without delay so the case could be readied for an early trial date.

In *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 252–54 (2d Cir.1985), the Second Circuit has provided its most expansive and comprehensive statement of the meaning and import of

Rule 11. Prior to Rule 11's recent amendment, courts awarded attorneys' fees as sanctions under Rule 11 or pursuant to their inherent power only on a finding that an attorney "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975) (citing *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974))). In *Browning Debenture Holders' Comm. v. DASA Corp.,* 560 F.2d 1078, 1088 (2d Cir.1977), it was held that there must be "clear evidence" that the allegations are "entirely without color and made for reasons of harassment or delay or for other improper purposes." *See also Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir.1980).

As was pointed out in *Eastway Construction Corp., supra,* at 252–54, Rule 11, as amended, requires the application of a stricter standard. The "language of the new Rule 11 explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed. Simply put, subjective good faith no longer provides the safe harbor it once did." *Id.* at 253.

The "new language [was] 'intended to reduce the reluctance of courts to impose sanctions ... *by emphasizing the responsibilities of the attorney.'* " *Id.* (citing Notes of the Advisory Committee on Rules) (emphasis in citation). Rule 11 now *mandates* the imposition of sanctions "when it appears that a pleading has been interposed for any improper purpose, *or where,* after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law...." *Id.* at 254 (emphasis in original).

Courts were admonished, however, "to avoid the wisdom of hindsight in determining whether a pleading was valid when signed, and *any and all doubts* must be resolved in favor of the signer. But where it is *patently clear* that a claim has absolutely no chance of success under existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands, Rule 11 has been violated. Such a construction serves to punish only those who would manipulate the federal court system for ends inimicable to those for which it was created." *Id.* (emphasis supplied).

We now examine the relevant facts in this case in the light of the *Eastway* yardstick. Movants seem to allege that ICI failed to make the factual inquiry which *Eastway* indicates is now required, was guilty of subjective bad faith and multiplied the proceedings unreasonably.

ICI was unable to establish at trial that Monarch, Central or FLM had conspired against or perpetrated a fraud on ICI, but that is not the equivalent of a finding that those contentions were totally without foundation or absolutely without a chance of success. ICI's counterclaims and cross-claim of conspiracy and fraud were dismissed as unproved because the evidentiary proof ICI sought to present to support these allegations constituted inadmissible hearsay. ICI argued then and continues to argue even now, without merit in my view, that the hearsay objections should not have been sustained, contending that an agency relationship linking Monarch and Central to FLM, RTC, Meredew and BIBL makes this evidence admissible.

At any rate, it is clear from the fragments of evidence admitted on the issue that ICI's claim of fraud and conspiracy have some basis in fact. Initially an entity called RDT held a binding authority from ICI to commit it to facultative reinsurance contracts. Meredew was with or dealt with RDT, and Vita used Meredew as FLM's London broker. Christopher Durkin, a principal of RDT, was responsible for having ICI transfer its binding authority from RDT to RTC and Peter Meredew. The reinsurance of livestock which RDT se-

cured under the binding authority from ICI constituted only a minor commitment by the company. When the binding authority was transferred, the scope and breadth of ICI's exposure was vastly magnified, apparently without ICI's knowledge.

Vita secured reinsurance for Central and Monarch at discount rates for the same livestock and bloodstock policies that former reinsurers refused to renew because of their past losses. Indeed there had been a history of losses on such insurance, and FLM was having difficulty securing reinsurance contracts on livestock and bloodstock. These factors were not disclosed to ICI.

Moreover, RTC/Meredew issued one set of cover notes for ICI's reinsurance commitments to Monarch and Central. RTC/Meredew and others created BIBL, a brokerage firm in Bermuda which issued a second set of cover notes for ICI's reinsurance commitments to the two plaintiff companies. The RTC cover notes, which Monarch and Central did not see until preparation for trial, indicated that Monarch and Central had secured a discount rate some 7% higher than they were accorded under the cover notes actually issued to them by BIBL. ICI saw the higher discount; Central and National saw and received lower (BIBL) discount rates. The differential was kept and divided among Durkin, Meredew, Harris, Vita and others. In an effort to hide their tracks, each of the above men became the beneficial owner of a company to which bearer shares were issued. These shares were held by a trustee in Guernsey. Funds were transferred to the beneficial owners through Argonaut (Guernsey) Ltd. Vita was a beneficial owner of one of the companies and received funds in Guernsey under this scheme.

There is no evidence that Monarch or Central participated in or knew what was going on. They did, however, obtain reinsurance at rates which might not have been available if ICI had had full disclosure of all the facts and if ordinary market forces had been at work. The managing broker for their bloodstock and livestock reinsurance was FLM whose chief, Vita as indicated, participated in the skimming scheme.

Monarch and Central succeeded on their claims, and ICI's counterclaims against them and its cross-claim against FLM were dismissed, but this success does not support a Rule 11 sanction against ICI. Vita appears not to have dealt with either of the plaintiffs in good faith, and he was part of a scheme that he must have known was skimming money from some source. While his clients received the discount rate, with which they could not quarrel and which they had no reason to question, Vita pocketed a secret 7% profit for himself. All the secrecy and machinations that were done in connection with the operation should have made clear to Vita that he was associated with less than honest people and profiting from a less than honest enterprise. While it is true that the binding authority ICI saw accorded Central and Monarch a discount rate of 32%, although plaintiffs only received 25%, one could say the fraud, if any, was against Central and Monarch. The fraud, however, was really against ICI. Central and Monarch would not have secured a 32% discount in the absence of this scheme; indeed the 25% they did secure would have been highly problematic absent the questionable circumstances surrounding this case. Thus, although Vita misled the plaintiffs about the true discount rate at which he had secured their reinsurance, they suffered no monetary loss. The losses were all borne by ICI.

At the very commencement of this litigation, ICI had reason for suspicion about these reinsurance contracts. It had to question how it had become so vastly exposed in these reinsurance contracts after RTC and Peter Meredew entered the scene. As discovery disclosed the machinations and Vita's share of the illegal profits, ICI had reason to suspect that Central and Monarch too might be implicated. ICI's counsel not only had the right, but also the duty, to probe to ascertain whether and the extent to which plaintiffs might be directly,

rather than indirectly, involved in the scheme to defraud ICI. The fact that no such evidence was found does not justify a Rule 11 sanction.

The amendment to Rule 11 was intended to make clear to the federal judiciary that it had the power, the responsibility and the tools to purge court calendars of senseless motions and needless pleadings. Rule 11 was not intended to shift the burden of litigation on to a losing party merely because it lost and was unable to prove its opponent's duplicity. Rule 11 may be invoked when such claims are made in bad faith, carelessly, or recklessly or without basis in fact or law. But here there was a sufficient foundation to warrant ICI's counterclaims and cross-claim, even though the allegations were not sustained at trial.

The motions for Rule 11 sanctions are denied. Since the § 1927 standard remains one of subjective good faith, it is clear from what has been said that the court finds no basis for imposing sanctions on ICI under that provision.

IT IS SO ORDERED.