Robert **TALL** and Aram **Tall**, Plaintiffs,

v.

The **TOWN OF CORTLANDT**, the Town Board of the Town of Cortlandt, the Town Attorney of the Town of Cortlandt, Metro–North Commuter Railroad Company, the Town Clerk of the Town of Cortlandt, Charles G. DiGiacomo, John E. Gaffney, Michael E. Mongero, Frank B. Cernese, Raymond R. Romash, Gerald Klein and Harriet L. Boyle, Defendants.

No. 87 Civ. 7773 (RWS).

United States District Court, S.D. New York.

March 16, 1989.

Grace W. Tall, Administratrix of Estate of Aram S. Tall, Montrose, N.Y., pro se.

Lovett & Gould, White Plains, N.Y., for defendants except Metro North; Jonathan Lovett, of counsel.

Walter E. Zullig, Jr., New York City, for defendant Metro North; Henry W. Herbert, of counsel.

Shea & Gould, New York City, former attorneys for plaintiffs; Herbert B. Evans, Howard B. Adler, of counsel.

## OPINION

SWEET, District Judge.

Defendants the Town of Cortlandt (the "Town"), the Town Board of the Town of Cortlandt (the "Town Board"), the Town Attorney of the Town of Cortlandt (the "Town Attorney"), the Town Clerk of the Town of Cortlandt (the "Town Clerk"), Charles G. DiGiacomo, Jack E. Gaffney, Michael E. Mongero, Frank B. Cernese, Raymond R. Romash (collectively the

"Town Board"), Gerald Klein and Harriet L. Boyle (collectively, the "Town defendants") have moved for summary judgment under Rule 56, Fed.R.Civ.P. dismissing the complaint of Robert Tall ("Robert") and Aram Tall ("Aram") (collectively, the "Talls"), and for Rule 11 sanctions against the Talls and their attorneys Messrs. Shea & Gould. Defendant Metro North Commuter Railroad Company ("Metro North") joined in the motion. Shea & Gould seek to be relieved as counsel for the Talls who have *pro se* opposed the motion of the Town defendants and Metro North. Upon the findings and conclusions set forth below, the motions of the defendants are granted, and summary judgment will be entered dismissing the complaint. Rule 11 sanctions will be imposed upon Shea & Gould.

This case is a messy one, partly because of the subject matter—the denial of permits to the Talls to conduct a mud bog race—and partly because of the relationship between the parties, initially, and now between the Talls and Shea & Gould. It is further complicated by the present *pro se* status of the Talls. Central to the resolution of the action brought under 42 U.S.C. § 1983 is an understanding of the process which barred the Talls from conducting a mud bog race, a denial which the Talls claim was constitutionally flawed.

### Prior Proceedings

The Talls filed their complaint in this court on October 30, 1987 alleging a § 1983 violation arising out of the defendants' joint action to prevent the Talls from conducting a Mud Bog Race (the "Race"). The Race is described in Paragraph 11 of the Complaint:

> A "Mud Bog" race is a competition in which operators of 4–wheel–drive trucks, mounted on gigantic wheels and tires, and tethered by a steel cable to a fifty-ton tow truck, register and pay an entry fee to drive their vehicles, one at a time, through a pit, approximately 250 feet long and 30 feet wide, which is filled with mud to a depth of 5 feet. The solo performance of each driver is timed and the one who passes through the bog in the shortest time and covers the longest distance is the winner.

The complaint alleged ten claims, five with respect to events in 1986 and five with respect to events in 1987.

### The 1986 Race

The first claim asserted that the Town Defendants and Metro North improperly denied the Talls a mud bog permit for May 31–June 1, 1986, *ex parte* instituted an eleventh hour state injunctive proceeding forbidding the conduct of the Race, and as a result deprived the Talls of the "economically viable use of their property" situated at 263 Albany Post Road in the Town of Cortlandt.

The second claim alleged that the Town, Town Clerk, Town Board and Town Attorney prevented Robert from filing with the Town Board an application for a parade permit in 1986, prevented him from appealing from the determination barring that filing, and denied him an opportunity to be heard with respect to that application in violation of the Talls' due process rights. On this claim, the Talls sought compensatory and punitive damages.

The third claim alleged that all of the defendants *ex parte* obtained a temporary restraining order so as to cause the May 31–June 1, 1986 Race to be cancelled or be rendered a financial failure, that defendants waited until the eleventh hour to do so in order to maximize the damage to the Talls, and that defendants publicized the existence of the restraining order so as to cause the number of spectators at the Race to be reduced. On this claim, characterized as comprising a deprivation of rights, privileges, and immunities, the Talls sought compensatory and punitive damages.

The fourth claim alleged that defendants secured the 1986 temporary restraining order maliciously to damage Robert by reducing the number of spectators at the Race of May 31–June 1, 1986. On this pendent state claim, compensatory and punitive damages were sought.

The fifth claim alleged that defendants' actions in obtaining and publicizing the fact of the 1986 temporary restraining order

were malicious and solely intended to injure Robert and to interfere with the Talls' "right to the free and unrestricted use of their property for an entirely legal purpose." Robert sought compensatory and punitive damages.

*The 1987 Race*

The sixth cause of action alleged that in 1987, the Town Defendants granted the Talls a mud bog permit but nonetheless intended to destroy the event financially by conspiring with Metro North, which allegedly instituted *ex parte* an eleventh hour state lawsuit at the Town's insistence in order to secure a preliminary injunction barring the conduct of a Race on July 11–12, 1987, and by publicizing the fact of that injunction in order to impair the financial success of the event. The Talls alleged that the defendants were motivated to injure them in order to force a sale of their property at a "distressed price" and to build a new railroad station on the Talls' property. They claimed that this conduct comprised an inverse condemnation which deprived them of the economically viable use of their property.

The seventh claim alleged that in 1987 all of the defendants had as their goal the financial failure of the Race of July 11–12, that they were motivated by a desire to construct a new railroad station on property which was ideally suited for that purpose, that defendants sought to obtain title to that property at a distress price, and that accordingly they obtained an eleventh hour injunction in order to reduce the number of spectators at the event. These events were alleged to deprive the Talls of their rights, privileges and immunities. Compensatory and punitive damages were sought.

The eighth claim alleges that defendants' 1987 actions were performed maliciously in order to interfere with "Plaintiffs' right to the free and unrestricted use of their property for an entirely legal purpose." Compensatory and punitive damages were sought on behalf of Robert.

The ninth claim alleged that Metro North and the Town Defendants conspired in 1987 to institute a state injunctive action and to obtain preliminary injunctive relief maliciously in order to deprive the Talls of their rights, privileges and immunities. Both punitive and compensatory damages were sought on behalf of Robert and Aram.

The tenth claim alleged that the 1987 state injunctive action was instituted and prosecuted by defendants on the basis of false factual representations and solely for the purpose of injuring plaintiffs, denying them their rights under 42 U.S.C. § 1983 and other rights, privileges and immunities. Compensatory damages were sought on behalf of Robert, and punitive damages are sought on behalf of Robert and Aram.

Robert's deposition was taken on June 22, 23 and July 18, after which he refused to be deposed further. The instant motion was made initially on October 17 and was argued on November 18, 1988. Submissions by the Talls have continued since the argument, the latest having been filed on February 24, 1989.

*Findings of Fact*

The affidavits, depositions, and exhibits submitted by the parties establish the following facts as uncontroverted:

Aram had Alzheimer's disease since at least 1976. His financial affairs were taken care of by his wife Grace ("Grace") and for several years he was unable to recognize his son, Robert. During 1986 and 1987, Aram had no personal interest in the property upon which the subject mud bogs were conducted. In 1980 he quit-claimed his interests in the property on which the Race was to be conducted to himself as a trustee for the benefit of Grace.

At the time of the events which are the subject of this action, Aram was senile and had nothing whatsoever to do with the Race. He was not financially involved in either the 1986 or 1987 Races, had no agreements of any kind with Robert with respect to the mud bogs, never discussed this action with Robert, and apparently never even read the complaint in this action.

For the three years prior to 1985, Robert organized private events similar to the Race on property located on Route 9A in

the district of Montrose, within the Town and in Westchester County (the "Property"). The Property was owned by Aram and Robert, and Aram and Grace lived on it.

On November 2, 1985, Robert conducted his first public race. No permits were issued and some 3,000 spectators attended. In April 1986, Robert began advertising for a Race that would take place on May 31 and June 1, 1986.

Early in May 1986, Robert was advised that in order to hold the Race, he needed a permit from the Westchester County Commissioner of Health. Such permit was obtained on May 14. Thereafter, Robert was advised by the Office of the Town Clerk that a Parade Permit would also be required and that insurance coverage would be required before the issuance of such a permit. Robert immediately went to his insurance agent—the Frank Carnese Agency—to purchase the required coverage and was informed that it was only able to obtain one-half of the required insurance coverage for him and would continue to try to obtain the rest.

Robert also learned that he had to file an application for the permit with the Town Board, after which filing the application would appear as an item on the agenda at the next Town Board meeting; that at that initial meeting, the Town Board was required to refer the application to the Town Attorney for an investigation and preparation of a report; and that after the filing of the Town Attorney's report, the application would appear as an item of old business on the agenda of the then next available Town Board meeting, at which time the Board could for the first time vote with respect to the application. Indeed, the Town Code states at § 9–11:

*Investigation of application; conditions of issuance.*

A. The Town Board upon presentation of such application as provided herein, and before acting on same, shall refer such application to the Town Attorney for a full investigation as to the truth of the statements contained therein and as to any or all other matters which might tend to aid the Town Board in determining whether or not such application should be granted.

B. The Town Board, upon receipt of a written report by the Town Attorney, shall decide whether a license should be issued, considering among other things the nature of the event, the nature of entertainment, and exhibitions to be produced, the location of the event, and the effect upon the peace, welfare and good order of the Town of Cortlandt ...

With this knowledge, Robert sought to obtain an application for a permit to conduct the 1986 mud bog on May 14, 1986. However, between May 14 and the dates on which he intended to conduct the Race, there was only one meeting of the Town Board. As a result, and because of the referral procedure contained in Code § 9–11 which required that a permit application appear on the agendas of at least two consecutive Board meetings before it could be voted on, no amusement permit was issued to him for the Race.

On May 20, 1986, the Town Board met in an Executive Session and passed a resolution: (a) authorizing the Town Attorney to commence an action to prevent the Race from occurring as scheduled; and (b) denying the application for the parade permit. On May 21, 1986 Robert secured the Town Board minutes from the previous evening and knew that the Town intended to seek to enjoin the conduct of the Race. Although he was advised that the State Supreme Court intended to conduct a hearing on the Town's request for a temporary restraining order, he failed to appear at that hearing.

Robert had in his possession the relevant provisions of the Town Code which provided in Section 9–7 that the application form for an amusement permit "shall be substantially as follows":

*Town of Cortlandt*

Application for Exhibition, Performance for Hire, Carnival, Circus, Carousel, Open-air Show or Place of Amusement

1. Name of applicant.

2. State whether individual, partnership or corporation.

3. If partnership, state names of all persons having an interest in the business.

4. If corporation, state names of its officers.

5. If corporation, give names of each stockholder, together with the number of shares of capital stock held by each.

6. Proposed location of event.

7. Nature of entertainment, exhibition, etc., to be produced.

8. A detailed account of each exhibition, entertainment, performance and/or amusement device to be located on the proposed location of the event.

9. State number of lights to be used and candlepower of each, all pieces of equipment for music, loudspeaker devices and other devices for the amplification of sound.

10. Has applicant or anyone owning interest in event been convicted of violating any ordinance or law pertaining to public morality or decency?

STATE OF NEW YORK )
COUNTY OF WESTCHESTER) ss:

, being duly sworn, deposes and says:

I am, above-named applicant, and make this affidavit for the purpose of obtaining from the Town of Cortlandt a license to conduct a as required by ordinance of the Town of Cortlandt, regulating conduct of persons therein, defining offenses and providing penalties for the violation thereof. I have personal knowledge of the matters stated in the foregoing application and the statements therein contained are true.

Sworn to before me this day of 19 .

———————————

Notary Public

Robert attempted to submit his application for the parade permit on May 29, 1986, but was advised by the Town Attorney's Office that the Town would not grant it and had already applied to the Court to enjoin the event from proceeding as scheduled.

On May 30, 1986, at approximately 4:00 p.m., Robert was personally served with copies of an order to show cause with a temporary restraining order and the summons and complaint in an action entitled *The Town of Cortlandt v. Aram Tall, Robert Tall, et al.,* in the Supreme Court of the State of New York, in and for the County of Westchester, Index No. 9637/86. The order temporarily enjoined the event pending a hearing before the court scheduled for June 6, 1986. However, Robert threw the temporary restraining order into a "garbage can" without even reading it.

On May 31, 1986 the first day of the scheduled Race, there were news reports that, because of the Town's action in obtaining a TRO, the event was illegal. Nevertheless, 3,000 spectators attended the two-day event, which was conducted as scheduled. Neither the Town nor Metro North sought an order from the court holding Robert in contempt for violating the temporary restraining order's injunction against the event taking place.

Robert scheduled his next Race event for July 11 and 12, 1987. On May 21, 1987 the Town of Cortlandt granted him an "Amusement & Exhibition Permit" for a "Mud Bog" on those dates, and Robert commenced advertising and publicizing it immediately thereafter.

On July 7, 1987, Metro North commenced an action, *Metro North v. Robert Tall and Aram Tall,* in the State Supreme Court in and for Westchester County, by way of a summons and verified complaint. The verified complaint and supporting affidavits alleged damage to Metro North's operations resulting from the Race and that certain excavating activity by Robert on a hillside on the Property, apparently unassociated with the Race, compromised the hillside and diverted the ground-water flow from its natural course into a stream which flows into Metro North's right of way,

thereby causing Metro North extraordinary maintenance and cleaning expenses.

Metro North obtained an *ex parte* order to show cause and temporary restraining order from the Supreme Court. Metro North's motion for a preliminary injunction was unopposed by Defendants, Robert having been served the day before the return day, and was granted. However, Robert held the Race as scheduled without incident, injury or damage to Metro North or anyone else. Metro North has not sought to have the court hold the Talls in contempt.

In 1987, defendant Frank Cernese attended the Race, as did most of the Town's employees. Defendants Michael Mongero and John Gaffney actively assisted in the conduct of the Race and the Town provided a sanitation truck and crew to assist in the Race. Prior to the mud bog, defendant Charles DiGiacomo agreed to "drop the flag," commencing the first race. Robert displayed a political sign on his property for Gaffney's benefit during Gaffney's recent campaign for the Office of Supervisor in the Town of Cortlandt.

Robert has stated that the alleged conspiracy between the Town and Metro North in 1987 was based upon a "hearsay story" told to him in "Shotsies" bar only three weeks prior to Tall's June 22, 1988 deposition testimony and that the hearsay story was admittedly premised upon additional hearsay that had been "heard down at ... Grand Central [station]."

Robert also stated that his contention that the defendants sought to build a new railroad station on his property was predicated upon a newspaper article which identified the site of a proposed new station as being on property "across the [railroad] tracks" and belonging to someone else, that the claim in the complaint that threats were made against Aram because of Defendants' conduct was false, and that material elements of the allegations pertaining to the sixth through tenth causes of action were premised upon "just hearsay," "[j]ust talk," and "my circumstantial evidence ... in my heart and my head."

Robert admitted that he timely received the railroad's injunctive application in 1987 and did not bother to read it until the date for the relevant court appearance had already passed.

Grace Tall has submitted court papers, portions of the Robert Tall deposition, and other materials. These fail to present a material factual conflict with the facts as stated above.

*Conclusions of Law*

*The Property Right*

Aram had divested himself of his rights in the Property and Grace was not a party to the action. Therefore, Aram's complaint must be dismissed for lack of a property interest.

Robert had no interest in the Property, and his right to conduct the Race was limited by the requirement of a permit. *See Matter of Keystone Associates v. Moerdler,* 19 N.Y.2d 78, 87, 278 N.Y.S.2d 185, 188, 224 N.E.2d 700 (1966) (distinguishing between reasonable enforcement of statutes for public health, safety and welfare on the one hand and condemnation statutes on the other). Robert's own actions in 1986 made the lawful issuance of such a permit prior to May 31 impossible, and therefore he possessed no property right.

Additionally, a claim of inverse condemnation requires a very substantial interference with the property owner's rights in order to be legally sufficient. *Cf. O'Brien v. City of Syracuse,* 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 429 N.E.2d 1158 (1981). Here, the only interference alleged was with respect to a single, two-day event which was conducted despite the alleged interference. Therefore, there is no material issue of fact, and the claims based on property right are dismissed.

*Constitutional Deprivation*

The facts as found fail to demonstrate any failure of due process at the hands of the Town Defendants. Aside from the alleged conspiracy with Metro North, there are no allegations of improper process in 1987, as indeed there cannot be, given the

issuance of the permit in 1987 and the cooperation of the Town Defendants.

As for the denial of the permit in 1986, the Talls have failed to make out an abuse of process claim. No attack has been launched on the constitutionality of the Town Code as such, no allegations of predetermination have been made, and there are no allegations of any irregularity with the process required by the Code. The constitutional claims against the Town defendants are, therefore, dismissed.

*The Metro North Conspiracy*

Robert acknowledged in his deposition testimony that he had no evidence or proof of any conspiracy between the Town and Metro North. Grace also acknowledged in her letter to the court dated October 9, 1988 and the accompanying letter to Shea & Gould that nowhere in Robert's or her collection of court papers, newspaper articles, photographs, radio transcripts, correspondence with attorneys and public officials or in her personal notes was there any proof of the existence of any conspiracy between the municipal Defendants and the railroad. No material facts have been set forth to establish the conspiracy, and summary judgment on the conspiracy claims is granted.

*The Metro North Tort*

■ With respect to the claims relating to the 1986 Race, the Talls' claims against Metro North are barred by reason of Public Authorities Law § 1276, which requires that any tort action against a subsidiary of the Metropolitan Transportation Authority be commenced within one year and thirty days from the date that the tort was committed. *Wenning v. MTA,* 112 A.D.2d 220, 491 N.Y.S.2d 437, 438 (2d Dep't, 1985). This action was not commenced until October 30, 1987, more than one year and thirty days after the 1986 Race, and thus it is barred by the statute of limitations.

In addition, under Public Authorities Law § 1276(1), the Talls were required to serve a demand upon the railroad to adjust their claim and to afford the railroad a reasonable opportunity within which to consider payment or adjustment of the claim prior to commencing suit. As a condition to suing Metro North, the Talls were required to allege in their complaint compliance with that requirement. Public Authorities Law § 1276(1); Rule 9(c), Fed.R. Civ.P. However, the Talls' complaint fails to allege compliance with the mandates of that requirement and, accordingly, the tort claim must be dismissed. *Fleming v. Long Island Railroad,* 130 A.D.2d 59, 518 N.Y.S. 2d 144 (2d Dep't 1987).

*The Metro North Injunction*

With respect to the 1987 Race, the Talls' claim of due process violation is without merit. The Race was scheduled to be held July 11–12, 1987. On July 7, 1987 Metro North filed its order to show cause, returnable July 9, 1987, which was served upon Robert on July 8. Robert, in his deposition testimony, acknowledged that he received the order to show cause and accompanying papers, but did not read them until after the scheduled court hearing had been held. Metro North has submitted an unrebutted affidavit that Robert, prior to the return date, communicated with the railroad and stated that he was not going to appear in court the following day for the hearing on the injunction.

■ Where a plaintiff has an opportunity to contest a defendant's action and fails to do so, there is no violation of his due process rights or of 42 U.S.C. § 1983. *Port Chester Yacht Club, Inc. v. Iasillo,* 614 F.Supp. 318 (S.D.N.Y.1985); *Barrett v. United States,* 651 F.Supp. 615 (S.D.N.Y. 1986). Plaintiffs' due process claims under 42 U.S.C. § 1983 are, therefore, frivolous and without merit. Finally, although Metro North is not immune from suit under § 1983, there are serious questions involved in a case such as this where a § 1983 action has been brought against apparently regular state court injunction proceedings.[1]

1. To the extent that the issue exists as to whether Metro North, as an agency of the state, is immune from a § 1983 suit in federal court pursuant to the 11th Amendment, *c.f. Welch v.* *State Dep't of Highways and Publ. Trans.,* 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987), it is not considered at this time.

*Sanctions*

An associate at Shea & Gould has submitted a sixteen page affidavit concerning the firm's retention by the Talls, their representations, the failure to supply evidence to support their representations, the difficulties presented by Aram's death in February 1988, and Robert and Grace's failure to take action to qualify Aram's estate as a party plaintiff. He recounted the problems of preparing Robert for his deposition, obtaining permission to conduct settlement negotiations with Metro North and alternatively the refusal of the Talls to give Shea & Gould the necessary authority to continue the litigation.

Grace has submitted a letter of October 9, 1988 stating that Shea & Gould through its associate guaranteed a substantial result, represented that it could bring influence to bear on Metro North, and failed to represent its clients properly after having been retained. In particular, according to Grace, there never was evidence of the conspiracy between Metro North and the Town Defendants.

The Town Defendants have noted that Shea & Gould on behalf of the Talls never sought depositions and conducted no discovery and that, in any event, by refusing to continue his deposition, Robert abandoned the litigation. The Town was billed $47,638.50 in fees and $2,401.30 in disbursements for the defense of this action.

*42 U.S.C. § 1988*

The circumstances under which a prevailing defendant is to be awarded fees under § 1988 were set forth by the Supreme Court in *Hughes v. Rowe*, 449 U.S. 5, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980), which borrowed its standard from *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), a case dealing with the award of attorney's fees to prevailing defendants under § 706(k) of the Civil Rights Act of 1964. In *Christiansburg*, the Supreme Court held:

> a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation,

even though not brought in subjective bad faith.

434 U.S. at 421, 98 S.Ct. at 700.

■ Sanctions under § 1988 may be assessed only against the opposing party, not its counsel. *Olivieri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir.1986), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987); *Eastway Construction Corp., et al. v. The City of New York*, 637 F.Supp. 558, 576 (E.D.N.Y.1986), *modified*, 821 F.2d 121 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). Accordingly, the Defendants are not entitled to be awarded their attorneys' fees, pursuant to 42 U.S.C. § 1988, from Shea & Gould as a matter of law. As for the Talls, based on the conversations and representations conceded by Shea & Gould at the time of the retention, their action was not unreasonable or frivolous.

*Rule 11*

The Second Circuit's objective interpretation of Rule 11 of the Federal Rules of Civil Procedure is virtually identical to the standard set forth in *Christiansburg*. This interpretation is set forth most recently in *Calloway v. The Marvel Entertainment Group*, 854 F.2d 1452 (2d Cir.1988), *cert. granted*, —— U.S. ——, 109 S.Ct. 1116, 103 L.Ed.2d 179 (1989):

> In considering sanctions regarding a factual claim, the initial focus of the district court should be on whether an objectively reasonable evidentiary basis for the claim was demonstrated in pretrial proceedings.... Where such a basis was shown, no inquiry into the adequacy of the attorney's pre-filing investigation is necessary. If no reasonable evidentiary basis for a factual claim was disclosed in pretrial proceedings ... the district court must then scrutinize the objective reasonableness of the attorney's pre-filing inquiry and the basis for the claim developed by that inquiry. If the inquiry was objectively reasonable under the circumstances and disclosed a reasonable factual basis for the claim, then sanctions are not appropriate. On the other hand, if the attorney either failed to make an

objectively reasonable inquiry or pursued a claim for which no basis was disclosed by such an inquiry, then sanctions are appropriate.

As to Shea & Gould, this action has turned into a lawyer's nightmare. Retained to defend the 1987 Metro North action, the associate in charge vigorously and appropriately pursued possible counterclaims and federal jurisdiction, accepting his clients' representations, in particular, that Metro North and the Town Defendants had a motive to act collusively, the acquisition of the Talls' property for a station at a bargain price.

■ There was some documentary evidence that the Defendants shared common goals in 1986. Rule 11 requires that an attorney make a prefiling inquiry to establish reasonable ground to believe that further investigation and discovery will prove his case, *See Fuji Photo Film U.S.A., Inc. v. Aero Mayflower Transit Co., Inc.,* 112 F.R.D. 664, 667 (S.D.N.Y.1986); *Monarch Insurance Co. v. Insurance Corp. of Ireland, Ltd.,* 110 F.R.D. 590, 594–95 (S.D.N.Y.1986), and where an attorney can get the information necessary to certify the validity of a claim in a public fashion and need not rely solely on his client, he must do so. *Nassau–Suffolk Ice Cream, Inc. v. Integrated Resources, Inc.,* 114 F.R.D. 684, 689 (S.D.N.Y.1987).

Shea & Gould relied not only on the story told by Robert and Grace, but on the court files in the 1986 Westchester Supreme Court action by the Town against the Talls and the 1987 Westchester Supreme Court action by Metro North against the Talls, correspondence between Metro North and Robert, newspaper articles and transcripts of news releases by the Town and Metro North.

■ However, given the presumptive difficulty of asserting this federal cause of action in the face of the apparent regularity of the Town and state court proceedings, it was essential to inquire further as to the nature of the pernicious motive being alleged, before signing a pleading containing those allegations. Such an inquiry would have revealed the absence of any probative evidence and indeed might have revealed the deficiencies of the clients, all too painfully revealed later, including the fact that Aram was not a proper party plaintiff. In short, on this key issue for constitutional litigation attacking state process, the inquiry was not reasonable.

As difficult as this determination is to make for the obvious reasons, equally difficult is the determination of an appropriate sanction. The resolutions of such problems in the past, *Calloway v. The Marvel Entertainment Group,* 854 F.2d 1452 (2d Cir. 1988), *cert. granted,* — U.S. —, 109 S.Ct. 1116, 103 L.Ed.2d 179 (1989) though comforting, do not solve the idiosyncratic nature of each sanction. Shea & Gould received a retainer of $10,000, the Town Defendants' defense cost over $42,000 and the Metro North expenses have yet to be submitted.

While the practical effect of Rule 11 sanctions may be to create movement in the direction of modifying the American rule requiring each party to pay its own litigation costs, the costs of the prevailing party is not the primary test of assessing the amount of sanctions. *See Calloway,* 854 F.2d at 1476; *Eastway Constr. Corp. v. City of New York,* 821 F.2d 121, 123 (2d Cir.1987). Instead, taking into account all circumstances of a case, an amount must be determined sufficient to constitute an appropriate sanction, not necessarily to make the moving defendants whole. Under these circumstances that amount is $25,000, to be paid by Shea & Gould to the defendants.

Absent an agreement between the defendants, a further motion will be heard in order to allocate the sanction amount between Metro North and the Town Defendants.

It is so ordered.