John A. HEALEY, Plaintiff,

v.

CHELSEA RESOURCES, LTD., Dominick & Dominick Securities, Inc., and Dominick & Dominick, Inc., Defendants.

No. 88 Civ. 6957 (RLC).

United States District Court,
S.D. New York.

Aug. 31, 1990.

See also 736 F.Supp. 488.

Whitman & Ransom (Michael S. Press, Michael G. Cary, of counsel), New York City, for plaintiff.

Cadwalader, Wickersham & Taft (Richard J. Wiener, Gregory M. Petrick, of counsel), New York City, for defendants Dominick & Dominick Securities, Inc. and Dominick & Dominick, Inc.

## OPINION

ROBERT L. CARTER, District Judge.

John Healey, a professional investor and resident of New York instituted this action against Chelsea Resources, Ltd. ("Chelsea"), a Canadian corporation, Dominick & Dominick Securities, Inc. ("Dominick Canada") and Dominick & Dominick, Inc. ("Dominick U.S.") alleging violations of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), § 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, C.F.R. § 240.10b–5, common law fraud and negligent misrepresentation, in connection with plaintiff's purchase of Chelsea securities. There was a bench trial from June 11 through June 14, 1990.

On May 2, 1990, counsel for Chelsea was allowed to withdraw, on the representation that counsel had not been paid and that Chelsea had instructed counsel to take no further action in the case. Counsel advised the court that he believed that Chelsea had no employees and had been sold or was in the process of being sold. (Letter to court from counsel for Chelsea dated April 30, 1990). Chelsea was not represented at trial and made no further appearance in the case.

## I.

The primary business of Chelsea was the development of the Spotted Horse, a gold mine, located in Lewistown, Montana. In November, 1986, a Dr. Neil Westoll issued a report on the Spotted Horse mine for Chelsea. Westoll certified in the report that it was based on his personal review of technical and other information provided by Cimarron Exploration, Inc. ("Cimarron"), Chelsea's joint-venture partner in developing the Spotted Horse mine. He also reported that he had visited the mine and that he had no interest in the mine and did not own any securities of Chelsea or of any of its affiliates.

In July, 1987, Robert Wong, a vice president and director of Dominick Canada, issued a report concerning the Spotted Horse mine. Wong visited the mine, spoke to Brian McAlister, Chelsea's president and chief executive officer, Westoll and the operators of the mine. On his return to Toronto he drafted his report and furnished a copy of the draft to Westoll and Chelsea officials. Westoll advised Wong that the data in the report was correct. Prior to its publication, the report was approved by Fernando Nuflo–Moya, Chelsea's chairman of the board of directors. At the outset the report contained the caveat that the information was "obtained from sources

believed to be reliable, but we cannot represent that it is accurate or complete." The report also indicated that Dominick Canada might "from time to time have a position" in Chelsea securities. Wong purchased 100,000 shares of Chelsea stock for his own account in the summer of 1987.

On August 21, 1987, Dominick Canada was retained by Chelsea as exclusive agent for a period of twenty-one (21) days for the private placement of 500,000 units consisting of one common share of Chelsea stock and one common share purchase warrant exercisable within one year. At that time Wong was no longer with the firm, having resigned to run for public office. Anthony Field, a Dominick Canada vice president, was charged with the responsibility of accomplishing the private placement.

On September 11, 1990, Field telephoned Healey in New York from his office in Toronto. He went over the salient points of the Wong and the Westoll reports and advised Healey that Wong's report relied on Westoll's data. Field indicated that he was relying on Westoll's reputation as an independent consultant. Healey indicated that he knew Westoll and had met him. Healey asked Field to send him whatever data he had.

Field sent Healey a copy of the Wong report, Chelsea's 1986 annual report containing audited financial statements for the periods ending October 31, 1986 and January 31, 1987, two August 20, 1987 Chelsea press releases and three status reports on the mine, dated March, 1987, June 16, 1987, and July 1, 1987, plus a summary of the offering prepared by Dominick Canada which stated that the purpose of the money to be raised via the private placement was to "repay loans to Newfield Minerals, Inc. and related parties." A footnote to the January 31, 1987 audited financial statement noted Chelsea's precarious current financial position by indicating that Chelsea continued, as of January 31, 1987, to have a working capital deficiency and had not up to that point been able to generate a sustained positive cash flow.

Field did not have a copy of the Westoll report, but Healey spoke directly to Westoll and discussed the latter's report and the Wong report, which Westoll advised Healey had relied on his report, and that he, Westoll, agreed with Wong's projections. He spoke very enthusiastically about the mine. Healey received the Westoll report on or about September 12, 1987. Healey sent the report to William Trebilcock, a gold analyst, for his review and comments. Trebilcock urged caution since he found the projections problematic. Because of Trebilcock's concerns, Healey held several additional phone conversations with Westoll over the next several days. They discussed the Westoll report in great detail and reviewed the projections. As a result of these discussions directly with Westoll, Healey was assured that Westoll's work was professional.

Healey read the materials sent to him by Fields. He also had numerous telephone conversations with Nuflo–Moya from September 12 or 13 onward. In those conversations Healey advised Nuflo–Moya that he had done his own due diligence in connection with the private placement, spoke of his extensive experience in mining operations, and stated that he was a director and investor in several mining companies in Canada and Australia and the owner of a company that invested in gold mining. Nuflo–Moya, who knew nothing about the technical aspects of a mining operation, was reassured by Healey's evident proficiency in that area, and they discussed the possibility of Healey becoming a member of Chelsea's board of directors.

On September 14, 1987, pursuant to the second telephone conversation between Healey and Field, the two met at the Toronto airport. Based on information supplied by Westoll, Field had prepared an update on Chelsea. He advised Healey that his projections were derived from data supplied by Westoll, that he had been unsuccessful in securing current financial information from Chelsea and that in order for Healey to obtain such data Field agreed to arrange for Healey to meet in Vancouver with Chelsea's senior management on a forthcoming trip west.

On September 18, 1987, Healey met with Brian McAlister and Michael Scholz, Chelsea's solicitor. From time to time Marion McCloud, Chelsea's chief financial officer, was also present. The meeting was held at Chelsea's headquarters in Vancouver and was somewhat lengthy. Healey told McAlister and Scholz that he had known Westoll for sometime, had looked at other projects in which Westoll was involved and liked his work. Healey asked McCloud to prepare for him a one-page cash balance statement to the end of September, 1987. She prepared the statement, and all items were discussed and explained.

The items labelled private placement funds were discussed. He was told that these items were projected funds which were expected on or about September 30 and that some, but not all, of the funds had been received as of September 18. He was advised that in order to meet various note obligations before September, Chelsea had to arrange bridge financing and that loans had been arranged from associates of McAlister or Scholz or company shareholders totalling $1,355,740, designated related parties loans on the statement. The statement also showed an amount owing Newfield Minerals pursuant to a settlement agreement. $1,432,259 was still owed Newfield and it was explained that this obligation would be met on October 1, 1987, with the payment of cash and the issuance of shares to Newfield. McCloud informed Healey that the outstanding payables of the Appaloosa joint venture was $431,679 Canadian. Scholz explained all the current litigation in which Chelsea was involved and the terms of the settlement of the claims of Newfield Minerals.

On October 5, 1987, McAlister and Nuflo–Moya met in Vancouver with representatives of City Resources. City Resources offered to advance some $9 million to Chelsea immediately, to purchase two (2) million units and to exercise their warrants within a year for an additional $19 million infusion of capital, which would give it about 40 percent ownership of the company. McAlister was very much in favor of accepting the offer, but Nuflo–Moya desired to get Healey's views before making a final deci-

sion. McAlister, Westoll and Nuflo–Moya flew to Toronto to meet with Healey the next day, October 6.

At this meeting McAlister spoke in favor of the City Resources proposal. McAlister told the group that he had visited the mine three times since meeting with Healey on September 18, and that he had become increasingly concerned with the problems that had to be dealt with at the mine and Chelsea's capability to handle them. The company might be required to put down another shaft which could cost a million dollars. Failure to put down the new shaft might result in the mine being closed. There were problems with the tailing pond, and doing what had to be done in that regard would require a $500,000 expenditure. He also indicated that a new hoist was needed and that it was necessary to build a shed over the conveyor belt so that it could continue to operate in the winter. Under these circumstances McAlister felt the prudent course was to accept City Resources' offer.

Healey disagreed. He did not want City Resources involved. He had a personal problem with one of City Resources' officials and threatened to withdraw his funding if the City Resources offer was acted on favorably. As an alternative he offered to make a commitment to exercise his warrants by the end of November and to arrange for further funding of $2 million. At about 4:30 in the afternoon Healey left the meeting. Shortly thereafter he called and asked the others at the meeting to come over to the office of Robert Buchan of Dynamic Capital. There they discussed the possibility of Dynamic Capital providing $2 million to Chelsea. At a subsequent meeting Buchan agreed to provide a $2 million line of credit. As a result of Healey's disapproval and his apparent success in securing alternative financing, the City Resources offer was not pursued further.

On October 13, 1987, Healey submitted his check to Dominick Canada for payment of his 500,000 Chelsea units. Healey was issued Chelsea stock certificates on October 14, 1987. There was a meeting of the Chelsea board in Vancouver on October 14,

1987. At that meeting Healey officially became a member of the Chelsea board. The board approved the Newfield settlement with the payment of $300,000 in cash and the issuance of shares of common stock. The board voted to terminate further discussions with City Resources. At this meeting the board reviewed the information as to the use of the private placement proceeds which was the same information given to Healey at the September 18 meeting.

On October 19, 1987, there was a worldwide stock market crash. As a result of the crash Healey was unable or unwilling to keep his commitment to exercise his Chelsea warrants. On December 9, 1987, Healey attended a meeting of the Chelsea board in Lewistown, Montana, near the Spotted Horse mine. At that meeting Healey voted along with the other board members to retain Dominick Canada and Field to do an additional private placement for Chelsea. Prior to the meeting, McAlister testified that Healey and he were walking back to the hotel where the board meeting was to be held. Healey told him that he was considering suing Dominick & Dominick, and that they would most likely be willing to settle since they would not want their good name smeared.

Healey attended a Chelsea board meeting on February 17, 1988, which unanimously approved Chelsea's audited financial statements for the period ending October 31, 1987. In February, 1988, Healey sold 100,000 of his Chelsea units to Northgate Exploration Ltd for $3.00 per unit. At Healey's request the board approved at the February 17, 1988 meeting a payment of $25,000 to Healey. McAlister testified that Healey insisted on the payment to make up the difference in the price he originally paid for his Chelsea units and the price he received from Northgate.

## II.

█ This case never should have been brought. There was more than a failure of proof at trial to establish any of the claims made. The proof clearly showed that Healey had no basis for making his claims and that he must have known that he instituted bogus litigation. Healey involved himself in this transaction eagerly, with full knowledge of the risks. Although receiving a word of caution from his own expert, he did not pause or hesitate in his quest for the gold just over the horizon, confident that his own superior resources, knowledge and expertise would gain him the prize he sought.

There were no misrepresentations made to Healey by either Dominick & Dominick or Chelsea, and even if it is assumed for the sake of argument that such misrepresentations were established, there clearly was no reliance. Healey spoke to Field on September 11, 1987, concerning Chelsea and the Spotted Horse mine. The two men did not know each other. Field had heard of Healey as one interested in gold securities. Healey had not used Dominick & Dominick for many years and did not know anyone associated with Dominick Canada or Dominick U.S. Field told him about the Westoll report and the Wong report which he advised Healey relied heavily on Westoll's data. Healey told Field that he knew Westoll. In this initial conversation Field avoided "hard sell" tactics. He told Healey that he had not made any independent verification of the technical and financial data in regard to Chelsea. Healey brushed this disclaimer aside assuring Field that he had the appropriate experience and skill to appraise such data on his own.

Healey read the Wong report and the audited financial statements received the next day. A legend in the Wong report indicated reliance on what was believed to be reliable sources, but the inability to represent that the information supplied was "accurate or complete." The financial statements evidenced a hazardous operation, showing among other downside financial indicators a deficit as of January 31, 1987, of some $1,457,365.

Healey contacted Westoll on his own and talked to him several times both before and after receiving the various materials. Westoll was enthusiastic about the prospects of success. Although Trebilcock, Healey's own expert, was not convinced

that the project would succeed, Healey was not deterred. On his own he made contact with the Chairman of Chelsea's board, Nuflo–Moya. During this and subsequent conversations with Healey, who presented himself as supremely knowledgeable concerning all technical aspects of a mining operation, Nuflo–Moya, who was totally ignorant in this area, began to rely on Healey's expertise.

Healey met Field at the Toronto airport on September 14, 1987. Two things are of significance in regard to this meeting. Field had prepared a one-page document containing his projections which he told Healey he had done in consultation with Westoll. Healey asked for Chelsea's current financial data, which Field could not supply. In that connection Field agreed to arrange for Healey to meet with Chelsea officials in Vancouver in the course of an immediate trip to that area so that Healey could obtain the desired financial information directly from Chelsea officials.

Healey had two other contacts with Dominick officials. He met Hugh G.W. Wilmer, a Dominick Canada vice president, in Calgary on or about September 15, 1987. Nothing relevant to our concerns occurred at that meeting. Healey met Peter Kennedy, president of Dominick U.S., in a brief meeting in New York, but there was no discussion of Chelsea or the Spotted Horse mine. All the other evidence in the record concerns meetings at which no one from Dominick was present.

At the September 18, 1987 meeting in Vancouver, Healey was given full and complete information on Chelsea's financial condition, the status of all litigation in which it was involved and the financial burden which the project faced in bringing the physical structures to the level so that the mine could be worked profitably. On October 6, 1987, Healey succeeded in preventing Chelsea from agreeing to take a huge and much needed infusion of financing from City Resources. McAlister was strongly in favor of accepting the City Resources proposal and, in seeking at that critical October 6th meeting in Toronto to convince Healey to agree with him, he emphasized the huge costs Chelsea faced in bringing the mine physically up to legal and operational standards. Under the circumstances of that October 6th meeting with McAlister intent on obtaining acceptance of the City Resources proposal, it would not have made sense for McAlister to withhold any bad news about the condition of the mine and its financial needs from Healey. Even if the fact finder had not been certain that Healey had received full and complete information about the probable costs in insuring the viability of the project before October 6, 1987, the only conclusion that can be reached from learning of the October 6, 1987 meeting and its contents was that Healey at least at that point was given all the facts.

There was no misrepresentation or failure to state a material fact by either Dominick or Chelsea to Healey. Without such a showing and evidence that Healey had no knowledge that a misrepresentation had been made or that a crucial fact was not disclosed, there is no viable claim for relief pursuant to § 12(2) of the Securities Act of 1933 or § 10(b) of the Securities Exchange Act of 1934. *Mayer v. Oil Field Systems Corp.*, 803 F.2d 749, 755 (2d Cir.1986). In addition, to succeed on the § 10(b) and Rule 10b–5 claim, there must be a showing of scienter on the part of defendants, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976), *reh'g denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976), or such recklessness as to amount to scienter. *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 575 (2d Cir.1982). There was no proof as to any defendant to meet this standard.

Plaintiff presented not one scintilla of evidence to keep Dominick U.S. in this case. As indicated, there was no evidence of any securities law violation by Dominick Canada, and there was no evidence whatever of any involvement or knowledge on the part of Dominick U.S. of the matters of concern in this proceeding. Accordingly, the attempt to establish controlling person liability fails. *Brickman v. Tyco Toys, Inc.*, 731 F.Supp. 101, 106 (S.D.N.Y.1990) (Carter, J.).

The negligent misrepresentation claim fails because of a lack of any credible showing of reliance on Healey's part. *White v. Guarente*, 43 N.Y.2d 356, 362–363, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315, 319 (1977). The common law fraud claim fares no better. *See Ajax Hardware Manufacturing Corp. v. Industrial Plants Corp.*, 569 F.2d 181, 186 (2d Cir.1977).

Whatever arguments remain need not be addressed since they are totally without merit. All claims are dismissed, and judgment is entered in favor of defendants Chelsea Resources, Ltd., Dominick & Dominick Securities, Inc., and Dominick & Dominick, Inc.

### III.

Subsequent to trial, the Dominick defendants filed a Rule 11, F.R.Civ.P., motion for sanctions against Healey and his attorney, Michael S. Press, seeking reimbursement for expenses and reasonable attorneys' fees. The grounds for the motion are frivolity and bad faith.

As Rule 11 makes clear, "sanctions shall be imposed against an attorney and/or his client when it appears that a pleading has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Eastway Constr. Corp. v. New York*, 762 F.2d 243, 254 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

The conduct of counsel being judged is measured by an objective standard of reasonableness under the circumstances. *Eastway Constr. Corp. v. New York, supra*, 762 F.2d at 253. Sanctions are required under Rule 11 "where it is clear that: (1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; and (3) no reasonable argument has been advanced to extend, modify or reverse the law as it stands." *Interna-*

*tional Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388, 390 (2d Cir.1989).

"[T]he central purpose of Rule 11 is to deter baseless filing in District Court ..." *Cooter & Gell v. Hartmarx Corp.*, —— U.S. ——, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). However, "courts must strive to avoid the wisdom of hindsight in determining whether a pleading was valid when signed, and any and all doubts must be resolved in favor of the signer." *Eastway Constr. Corp. v. New York, supra*, 762 F.2d at 254. Rule 11 is aimed at situations where it is clear that the claim has no chance of success. *Stern v. Leucadia Nat. Corp.*, 844 F.2d 997, 1005 (2d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988). If a violation of Rule 11 is found, sanctions must be imposed, although a court has discretion in fashioning an appropriate penalty. Only the individual attorney who signs a pleading, motion or paper is liable under Rule 11. *Pavelic & LeFlore v. Marvel Entertainment Group, Div. of Cadence Industries Corp.*, —— U.S. ——, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989). The law firm to which the attorney belongs is not liable. *Id.*

Section 11(e) of the Securities Act of 1933 provides, in pertinent part:

> In any suit under this or any other section of this subchapter [§§ 77a–77aa of this title] ... if judgment shall be rendered against a party litigant, upon the motion of the other party litigant, such costs may be assessed in favor of such party litigant ... if the court believes the suit ... to have been without merit, in an amount sufficient to reimburse him for the reasonable expenses incurred by him, in connection with such suit ...

For the purposes of § 11(e), a claim is "without merit" if it borders on the frivolous or has been brought in bad faith. *Rubin v. Long Island Lighting Co.*, 576 F.Supp. 608, 615 (E.D.N.Y.1984). Counsel may be assessed fees under § 11(e). *Id.* at 616, n. 12.

▬ "Rule 11 was not intended to shift the burden of litigation on a losing party merely because it lost and was unable to prove its opponent's duplicity." *Monarch*

*Insurance Co. v. Insurance Corporation of Ireland, Ltd.*, 110 F.R.D. 590, 595 (S.D. N.Y.1986) (Carter, J.). While a party or counsel may be subject to sanction for filing a spurious complaint, discontinuing a claim after the pleading stage must be distinguished from those pressed after it has become clear that they have no chance of success. *Fuji Photo Film U.S.A., Inc. v. Aero Mayflower Transit Co*, 112 F.R.D. 664 (S.D.N.Y.1986) (Carter, J.).

■ This motion was filed after trial but before final determination and in their reply brief defendants raised the issue of a possible conflict of interest between plaintiff and his counsel, citing *Calloway v. Marvel Entertainment Group, Div. of Cadence Industries Corp.*, 854 F.2d 1452, 1456 (2d Cir.1988), *rev'd on other grounds sub nom. Pavelic & LeFlore v. Marvel Entertainment Group, Div. of Cadence Industries Corp.*, —— U.S. ——, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989). That issue is somewhat troubling but need not detain us long.

It is altogether clear that this case is frivolous. It is also conceivable, and indeed likely, that plaintiff was not forthcoming with counsel initially and that counsel entered the case with the good faith belief that it had substance and merit. However, once the evidence was in, it is difficult for me to understand how counsel could possibly have persisted. There was no evidence whatsoever of the involvement of Dominick U.S. That awareness should have resulted in a dismissal of that claim at least on the eve of trial. It was also manifest early on that plaintiff placed reliance on his own resources in this case, that he knew of Neil Westoll at least by reputation prior to contact with Field, and that the case against Dominick Canada had to collapse once the events surrounding the October 6th meeting were disclosed. If that was not enough, the fact that Healey as a member of the Chelsea board of directors voted on December 9, 1987, to retain Dominick Canada and Field for another private placement effort should have made it crystal clear to counsel that he should not proceed with this case further. With all of those

indices of spuriousness and with counsel pressing on, I must conclude that Press continued to act as counsel in this case with full knowledge that it had no merit. Accordingly, I see no conflict here.

Healey's testimony at trial was totally lacking in credibility, and I am personally convinced that he brought this action in bad faith with the deliberate intent to blackmail the Dominick defendants into paying him off. My belief in that regard is strengthened by his and Press' explanation or justification that he might have told McAlister that he was considering suing Dominick. His reaction is deemed "perfectly understandable, especially given the shocking news ... [that] deliveries had not been made, contractors had not fulfilled their work schedules, the mine had not been winterized and, despite the infusion of more than $2 million less than two months earlier, Chelsea had run out of cash." Declaration of Michael S. Press in Opposition to the Motion, dated July 12, 1990 at 6–7. Although Healey does not recall having made the statement attributed to him by McAlister, he admits he might have made the statement about contemplating suing Dominick because he "learned for the first time that Cimarron was sitting on a large number of payables because Chelsea did not have the cash to pay them, (b) (sic) that Neil Westoll was on the operating committee of the Appaloosa joint venture and was not 'independent' of Chelsea, and (c) (sic) that the mine had yet to be winterized." Affidavit of John A. Healey in Opposition to the Motion, dated July 5, 1990 at 3.

This fabricated explanation of Healey's indiscretion is an obvious contrivance. First, as to Westoll, Healey dealt with him at length in person and by telephone. Westoll was with the group that met with Healey in Toronto on October 6th to seek his views on the City Resources proposal. It is simply not credible that at that point Healey was not fully conversant with Westoll's role in the project. Second, Healey was outraged by Dominick's duplicity when he spoke to McAlister, nonetheless he immediately went to the Board meeting and voted to engage Dominick and Field for another assignment.

354

That Press would be a party to such patent duplicity is further evidence that both he and Healey are equally at fault in infringing Rule 11 parameters.

Accordingly, I hold that defendants are entitled to an award of sanctions against plaintiff and his counsel, Michael S. Press, of expenses and their reasonable attorneys' fees. Counsel for defendants are to file an affidavit validating their expenses and fees incurred in defense of this action. Plaintiff may file opposition papers, and the parties may agree among themselves on a schedule, provided the matter is fully submitted by October 15, 1990.

IT IS SO ORDERED.